**William Neal MOORE, Petitioner-Appellant,**

v.

**Ralph KEMP, Respondent-Appellee.**

No. 84–8423.

United States Court of Appeals, Eleventh Circuit.

July 27, 1987.

John Charles Boger, New York City, for petitioner-appellant.

Susan V. Boleyn, Asst. Atty. Gen., Atlanta, Ga., for respondent-appellee.

Before RONEY, Chief Judge, GODBOLD, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, JOHNSON, HATCHETT, ANDERSON, CLARK and EDMONDSON, Circuit Judges.

GODBOLD, Circuit Judge:

Petitioner Moore raised in a second federal habeas petition new grounds not raised in his first federal petition and allegedly based upon new principles of law laid down since the first federal petition. The major decision for the en banc court concerns the determination of whether this was an abuse of the writ under Rule 9(b) of the Rules Governing Section 2254 Cases.

Moore was convicted of murder in Georgia after a plea of guilty and sentenced to death. He has filed a first state petition for habeas, followed by a first federal petition, a second state petition, and now the second federal petition. In the present case the district court denied all nine grounds asserted on the basis of abuse of the writ. A divided panel of this court affirmed and adopted the district court opinion. *Moore v. Zant*, 734 F.2d 585 (11th Cir.1984). Judge Kravitch dissented. 734 F.2d at 601. We set out in the margin a chronology of the key events in this litigation.[1]

Five issues are pressed before the en banc court:

(1) The state failed to advise Moore of his right to remain silent or of his right to counsel prior to or during a presentence interview conducted by a probation officer after conviction and before sentencing, a claim based on *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).

(2) The state denied Moore the right to confront and cross-examine witnesses whose hearsay testimony was considered in the presentence report, a claim based on *Proffitt v. Wainwright*, 685 F.2d 1227 (11th Cir.1982), *modified*, 706 F.2d 311 (11th Cir.), *cert. denied*, 464 U.S. 1003, 104 S.Ct. 509, 78 L.Ed.2d 698 (1983).

(3) Neither Moore nor his counsel was afforded adequate opportunity to review the presentence report prior to the sen-

---

1. 1974: Plea of guilty and sentence; affirmed on merits by Georgia Supreme Court. *Moore v. State*, 233 Ga. 861, 213 S.E.2d 829 (1975) (per curiam), *cert. denied*, 428 U.S. 910, 96 S.Ct. 3222, 49 L.Ed.2d 1218 (1976).

January 1978: First state habeas petition filed. Relief denied July 13, 1978, after evidentiary hearing.

November 22, 1978: Federal habeas petition filed.

March 19, 1979: Habeas counsel moved to withdraw.

April 1979: Petitioner pro se moved to amend to assert several new grounds, including ineffectiveness of counsel.

June 18, 1979: Hearing before magistrate. Petitioner asserted that his attorney referred to conflict between him and Moore on whether ineffective counsel claim should be asserted and magistrate refused to take evidence on issue or to permit petitioner to file an affidavit.

September 30, 1980: New habeas counsel Hicks retained.

October 1, 1980: Motion to amend by new counsel Hicks to add five grounds. State objected to proposed amendments by petitioner and Hicks.

April 8, 1981: Present (third) habeas counsel retained.

April 29, 1981: District court denied relief from conviction, granted writ as to sentence on ground of no proportionality review by Georgia Supreme court. The court also denied both motions to amend (by Moore, pro se, and by Hicks). *Blake v. Zant*, 513 F.Supp. 772, 803–18 (S.D.Ga.1981).

1981–1983: Appeal by state to Eleventh Circuit. Moore cross-appealed on refusal to allow his *pro se* amendment. Granting of writ reversed and relief denied on cross-appeal on ground of no abuse of discretion. *Moore v. Balkcom*, 716 F.2d 1511 (11th Cir.1983), *cert. denied*, 465 U.S. 1084, 104 S.Ct. 1456, 79 L.Ed.2d 773 (1984).

May 11, 1984: Second state habeas petition filed. Dismissed without hearing. Review denied by Georgia Supreme Court.

May 18, 1984: Second federal habeas petition filed. District court denied relief May 22 on abuse of writ grounds.

June 4, 1984: A panel of the Eleventh Circuit affirmed on district court opinion. *Moore v. Zant*, 734 F.2d 585 (11th Cir.1984).

tencing proceeding, in violation of *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977).

(4) Ineffectiveness of trial counsel at sentencing phase.

(5) Racially discriminatory application of the death penalty in the State of Georgia.[2]

## I. The *Estelle v. Smith* claim

In his second state petition, filed in 1984, Moore raised claim (1) of the list above—the failure to advise him of his right to remain silent and of his right to counsel prior to a presentence interview by a probation officer after conviction and before sentencing. The officer interviewed Moore in connection with the preparation of a presentence report that was introduced by the state at the sentencing phase of Moore's trial.

This claim was based on *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), which was not decided until three weeks after Moore's first federal petition was decided by the district court.[3] In *Smith* a court ordered the psychiatric examination of Smith, a Texas state prisoner, while he was in custody. Smith was not advised of his right to remain silent when examined by the psychiatrist nor was he told that any statement he made to the psychiatrist could be used against him at the ensuing sentencing hearing. The Supreme Court held that admission of the interrogating doctor's testimony

at the sentencing phase of Smith's trial violated his fifth amendment privilege against self-incrimination and his sixth amendment right to counsel as well. Moore seeks to apply *Smith* to the presentence interview conducted of him by a probation officer after his conviction but before his sentencing.

The state court denied the *Smith* claim. First, it held that Moore had previously litigated the issue unsuccessfully. The court did not mean this literally but rather, as its opinion explains, Moore had known the facts concerning his interview by the probation officer and in the first state habeas had raised the issue of opportunity to comment on and explain the report, and therefore, he could have raised the question of failure to advise him of his right to remain silent and his right to counsel; having failed to do so he had "waived the right to do so in this successive habeas petition." Second, the court held that *Smith* did not establish a new constitutional principle because the Supreme Court had relied on its prior decisions in *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) and *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

This issue was then presented in the second federal petition, filed immediately after the second state petition was denied, raising for the first time in the federal court a principle of law alleged to be new and to have been laid down since the first federal petition, and giving rise to an abuse of the writ issue under Rule 9(b). Four

---

**2.** The district court also rejected four other grounds for relief in Moore's federal habeas corpus petition:

 2) Petitioner was sentenced on the basis of materially false and misleading information contained in the presentence report.

 ....

 5) The presentence report defects prevented petitioner from obtaining a meaningful appellate review in violation of his [sic] Eighth and Fourteenth Amendments.

 6) Petitioner's death sentence is excessive and disproportionate under the Eighth and Fourteenth Amendments since it was imposed despite his repeated and uncontradicted denial of any intent to kill the victim.

 ....

 9) Since the sentencing judge expressly relied on the prospect of appellate review or the

United States Supreme Court's invalidation of Georgia's capital statutes, [he] attached diminished consequences to the sentence of death as imposed and thus took less than full responsibility for the sentencing decision in violation of petitioner's Eighth and Fourteenth Amendment right.

734 F.2d at 589 (district court opinion).

**3.** The district court decision granting relief in *Smith* was decided December 10, 1977, shortly after Moore's first state petition was filed. The Fifth Circuit affirmed September 13, 1979, more than a year after the first federal petition was filed but more than a year before the proposed Hicks amendment was filed. See n. 1, *supra.* The decision by the Supreme Court in *Smith* was entered May 18, 1981, three weeks after the district court ruled on the first federal petition.

days after filing, the district court denied the claim on abuse of the writ grounds.[4] We hold that the *Smith* claim in the second petition was not properly dismissed under Rule 9(b) and remand for reconsideration of this issue on the merits.

Absent deliberate withholding or intentional abandonment of a claim in the first federal petition, the inquiry into whether a petitioner has abused the writ in raising a new law claim must consider the petitioner's conduct and knowledge at the time of the preceding federal application.[5] Rule 9(b) allows dismissal of a claim when "the failure of the petitioner to assert those grounds in the prior petition constituted an abuse of the writ." *Accord* 28 U.S.C. § 2244. The focus on petitioner's conduct is mandated by the basic purpose of the abuse of the writ doctrine—to enforce the "equitable principle[ ] ... that a suitor's conduct in relation to the matter at hand may disentitle him to the relief he seeks." *Sanders v. U.S.*, 373 U.S. 1, 17, 83 S.Ct. 1068, 1078, 10 L.Ed.2d 148 (1963). An evaluation of a petitioner's conduct in omitting a claim from his first petition necessarily hinges on the petitioner's awareness of the factual and legal bases of the claim when the first petition was filed.[6] *See Haley v. Estelle*, 632 F.2d 1273, 1275 (5th Cir.1980) (a petitioner may assert in a second petition a claim based on facts or legal theories about which he had no knowledge at the time of his prior habeas petition).

Moore was represented by counsel at the time his first federal habeas corpus petition was filed. He is chargeable with counsel's actual awareness of the factual and legal bases of the claim at the time of the first petition and with the knowledge that would have been possessed by reasonably competent counsel at the time of the first petition. *Cf. Daniels v. Blackburn*, 763 F.2d 705, 710 (5th Cir.1985) (finding abuse where "[e]ach of the claims that Daniels has asserted in this proceeding is a claim of which competent habeas counsel would have been aware at the time Daniels' prior federal petition was filed in 1980").

We turn next to the state of the law in November 1978—the time of Moore's first federal petition—with respect to the state's failure to advise Moore of his fifth amendment right to remain silent and of his sixth amendment right to counsel prior to or during the presentence interview conducted by a probation officer after conviction and before sentencing. We hold that in November 1978, two and a half years before *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), reasonably competent counsel preparing the first petition could not reasonably have been expected to foresee the fifth and sixth amendment implications of Moore's presentence interview. In particular, counsel is not chargeable with an anticipation of the potential intersection of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) with the sentencing phase of a bifurcated Georgia capital murder trial. As a result, Moore's failure to raise the *Miranda* claim in his first habeas corpus petition was not an abuse of the writ.

The failure of Moore and counsel in 1978 to anticipate the application of *Miranda* in the context of the sentencing phase of Georgia's bifurcated capital proceeding is reasonable in light of the lack of clear guidance in 1978 with respect to constitutional protections that might attach to the

4. It impliedly rejected the state court's statement that Moore had previously litigated the *Smith* claim and proceeded directly to the conclusion that *Smith* was not "new law."

5. Of course, the court may not have to consider whether a new law claim on a successive petition is abusive if it determines that the new claim is wholly without merit. The Court in *Sanders* provided that the abuse of the writ rules "are not operative in cases where the second or successive application is shown, on the basis of the application, files and records of the case alone, conclusively to be without merit." *Sanders v. U.S.*, 373 U.S. 1, 15, 83 S.Ct. 1068, 1077, 10 L.Ed.2d 148 (1963). This policy is incorporated into Rule 4 of the Rules Governing Section 2254 Cases (authorizing summary dismissal "[i]f it plainly appears from the face of and any exhibits annexed to it that the petitioner is not entitled to relief").

6. Awareness of the *factual* basis for a claim at the time of a prior federal habeas petition is a question not before us.

sentencing phase. Georgia's bifurcated death penalty procedure had been approved by the Supreme Court in 1976. *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). It was not immediately obvious, however, that the constitutional protections normally accorded to a defendant's merits trial would be applied to sentencing phases in general, or Georgia's in particular, much less that *Miranda* might be so applied. In 1982, four years after the 1978 date as of which we are assaying what Moore and his counsel reasonably should have foreseen, the Eleventh Circuit noted that "[t]raditionally, sentencing hearings have not been accorded the significance of the guilt-determination portion of the trial." *Proffitt v. Wainwright,* 685 F.2d 1227, 1252 (11th Cir.1982), *modified,* 706 F.2d 311, *cert. denied,* 464 U.S. 1002, 104 S.Ct. 508, 78 L.Ed.2d 697 (1983). This court went on to say in *Proffitt* that in light of recent Supreme Court decisions, "[t]he view, *once prevalent,* that the procedural requirements applicable to capital sentencing are no more rigorous than those governing noncapital sentencing decisions ... is no longer valid." *Id.* at 1253 (emphasis added).[7]

Further evidence of a lack of clear guidance in 1978 with respect to sentencing phases is revealed by looking at the cases on which the Supreme Court relied in its opinion in *Estelle v. Smith.* The Court, in 1981, cited three cases in support of the application of certain constitutional guarantees to the Texas penalty phase: *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977); *Presnell v. Georgia,* 439 U.S. 14, 99 S.Ct. 235, 58 L.Ed.2d 207 (1978); and *Green v. Georgia,* 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979). Of these, *Presnell* (decided November 6, 1978) and *Green* (decided May 29, 1979) were handed down by the Supreme Court after Moore's first federal habeas petition was filed in 1978. The statement in *Gardner,* a year before Moore's first federal petition, that "the sentencing process, as well as the trial itself, must satisfy the Due Process

Clause" appears in a plurality opinion of three justices. 430 U.S. at 358, 97 S.Ct. at 1204. The concurring opinions do not clearly ascribe to this position. *See id.* at 364, 97 S.Ct. at 1207 (White, J., concurring) ("I see no reason to address in this case the possible application to sentencing proceedings—in death or other cases—of the Due Process Clause, other than as the vehicle by which the strictures of the Eighth Amendment are triggered in this case.").[8]

When Moore filed his first federal petition, therefore, the extent to which constitutional protections for criminal defendants would apply to capital sentencing proceedings was not clear—the full panoply of protections, or less than the full array, and if less, what was to be included? *Cf. Proffitt,* in *1982:* "[a]lthough the [Supreme] Court has held capital sentencing proceedings must meet certain procedural requirements, it *has not yet delineated* the exact scope of constitutional procedural protection to which capital defendants are entitled." 685 F.2d at 1253 (emphasis added). In 1980, two years after Moore filed his first petition, the State of Texas was arguing before the United States Supreme Court in *Smith* that Smith "was not entitled to the protection of the Fifth Amendment because [the] testimony was used only to determine punishment after conviction, not to establish guilt" and that "the Fifth Amendment privilege has no relevance to the penalty phase of a capital murder trial." *Smith,* 451 U.S. at 462, 101 S.Ct. at 1872.

Next, we analyze the decision in *Smith* with particularity, to see what light it sheds on the question of the foreseeability to counsel in 1978 of the possibility that *Miranda* would have plenary applicability to the sentencing phase of a Georgia-type capital murder trial. In *Smith* the Court found a violation of Smith's fifth and sixth amendment rights where the State of Texas introduced, at the sentencing phase of his capital murder trial, the testimony of a psychiatrist who, pursuant to court order, had interviewed him to determine his com-

---

7. See Part II, *infra,* for a discussion of Moore's *Proffitt* claim.

8. The other concurrences did not consider the issue.

petency to stand trial. The Court held that in light of *Miranda* the psychiatrist's testimony could not be used at the sentencing phase because Smith had not been given *Miranda* warnings. In *Gray v. Lucas,* 677 F.2d 1086, 1096 n. 9 (5th Cir.1982) the Fifth Circuit spoke to whether Gray's counsel should have foreseen the circuit's own opinion in *Smith* (handed down in 1979, a year and a half before the Supreme Court decided *Smith* ): "Because our opinion in *Smith* was delivered three years after Gray's trial, we do not fault Gray's counsel for not anticipating our holding."[9]

Analysis of why Moore and his first habeas counsel, in 1978, could not reasonably have been expected to anticipate a *Smith* -type[10] claim requires understanding the importance to the *Smith* decision of the special nature of a Texas sentencing proceeding in a bifurcated capital trial.[11] This is seen in the Fifth Circuit's analysis of *Smith* in *Battie v. Estelle,* 655 F.2d 692 (5th Cir. Sept. 11, 1981), a decision binding on our court. In connection with the issue of the applicability of *Miranda* to the sentencing phase of the trial in *Smith,*[12] *Battie* said:

> *Smith* only held the fifth amendment privilege applicable to the sentencing stage of a capital trial in Texas because the State of Texas must prove a capital defendant's future dangerousness as an issue separate and distinct from proof of his guilt. The applicability of the privilege to mandatory or discretionary sentencing procedures not requiring proof of such an additional prerequisite to impose a criminal punishment raises different questions not necessarily resolved by *Smith.*

655 F.2d at 698 n. 10. The Georgia statute under which Moore was sentenced requires only consideration of aggravating and mitigating circumstances and does not require any proof of future dangerousness. *See* O.C.G.A. § 17–10–30. It would be anomalous for us to charge Moore's counsel with an awareness in 1978 of a proposition that remained unclear to the Fifth Circuit almost three years later (and four months after it had the benefit of *Smith* ), namely

---

**9.** The Fifth Circuit's opinion in *Smith* could not have given Moore's counsel any guidance, for it came a year after Moore's first federal petition.

**10.** Because we hold that Moore's counsel is not chargeable with an awareness of the *Smith* principle, we need not decide whether he would also have been expected to discern the possible application of the *Smith* principle to investigations conducted by a probation officer, who is in a sense a representative of and officer of the court, having a specialized function in the processes of the court, instead of a psychiatrist, who has a different function but is not an arm of the court itself.

**11.** It is by no means clear, even now, that *Smith* would apply in non-capital cases where a trial judge has wide discretion to consider information in imposing sentence. *See Baumann v. U.S.,* 692 F.2d 565, 576 (9th Cir.1982) (distinguishing *Smith* as involving a bifurcated death proceeding where discretion on sentencing is channelled whereas *Baumann* involved a "routine presentence interview[ ] conducted for the benefit of a district judge in the exercise of his substantial discretion at sentencing").

**12.** *Battie* also considered a different aspect of the relationship of *Smith* to the state of the law before *Smith* was announced. The Fifth Circuit held that the ruling of *Smith* that the pretrial psychiatric competency examination was an official custodial interrogation of the type protect-

ed by *Miranda* would apply retroactively because it did not announce a new principle of constitutional law. This does not speak to the issue before us, namely whether the intersection in *Smith* of *Miranda* and capital sentencing proceedings conducted under the Georgia statutory scheme should have been anticipated by counsel in 1978.

The Eleventh Circuit has pointed out that a determination of the retroactivity of a decision is a different inquiry than the question of what counsel should have foreseen before the decision was handed down. In *Alvord v. Wainwright,* 725 F.2d 1282 (11th Cir.), *cert. denied,* 469 U.S. 956, 105 S.Ct. 355, 83 L.Ed.2d 291 (1984), the court observed that different answers could be given to the questions of whether *Smith* applied retroactively and whether counsel should have anticipated *Smith.* The court contrasted *Battie* with the holding of the new Fifth Circuit in *Gray v. Lucas,* 677 F.2d 1086, 1096 n. 9 (5th Cir.1982), *cert. denied,* 461 U.S. 910, 103 S.Ct. 1886, 76 L.Ed.2d 815 (1983) that counsel was not deficient in failing to anticipate *Smith.* *Alvord,* 725 F.2d at 1293. *See also Francois v. Wainwright,* 741 F.2d 1275, 1285 (11th Cir.1984) (the failure to raise an issue that only later gains judicial recognition does not render counsel ineffective); *Sullivan v. Wainwright,* 695 F.2d 1306, 1309 (11th Cir.), *cert. denied,* 464 U.S. 922, 104 S.Ct. 290, 78 L.Ed.2d 266 (1983) (same).

that *Miranda* protections would be applicable to the sentencing phase of a Georgia-type death penalty proceeding.

The Supreme Court has told us that "a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984); *accord Smith v. Murray,* 477 U.S. 527, ____, 106 S.Ct. 2661, 2667, 91 L.Ed.2d 434 (1986). An attorney's failure in 1978 to recognize the potential intersection of *Miranda* and Georgia capital sentencing proceedings, does not cause his performance to fall outside of "the wide range of professionally competent assistance." *See Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. Consequently, we cannot charge Moore with the knowledge of the legal basis of this claim at the time of his first petition and therefore hold that his conduct in omitting the claim was an not abuse of the writ warranting dismissal under Rule 9(b). Absent such an abuse of the remedy, the federal courts should hear the merits of the claim on habeas corpus. Accordingly we remand to the district court for a consideration of the merits of Moore's claim regarding his presentence interview.

## II. *Proffitt v. Wainwright* claim

■ In Moore's second habeas petition he raised another "new law" claim. He alleged that the state denied him the right to confront and cross-examine witnesses whose hearsay testimony was considered in the presentence report. This claim is based on *Proffitt v. Wainwright,* 685 F.2d 1227 (11th Cir.1982), *modified,* 706 F.2d 311 (11th Cir.), *cert. denied,* 464 U.S. 1003, 104 S.Ct. 509, 78 L.Ed.2d 698 (1983), which was decided by the Eleventh Circuit on September 10, 1982, five months after the district court decided the first federal petition. In *Proffitt* this court recognized the specific constitutional right accorded a capital defendant to cross-examine a psychiatrist whose report of a presentence examination of the defendant was considered by the trial court in its sentencing decision. *Id.* at 1251–55. Moore seeks to apply this case to

witnesses whose statements were included in his presentence report.

The state habeas court denied the claim, holding that there was no new factual basis for the claim and that *Proffitt* did not establish a new constitutional principle because the Eleventh Circuit had relied "on the landmark decisions of the Supreme Court of the United States in *Douglas v. Alabama,* 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965) and *Pointer v. Texas,* 380 U.S. 400, 404, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965)." In this second federal habeas petition the district court rejected the *Proffitt* claim under the same abuse analysis that it applied to the *Estelle v. Smith* claim. As with the *Smith* claim, we cannot charge Moore with the knowledge of the legal basis of this claim at the time of his first petition and we hold that his conduct in omitting the claim was not an abuse of the writ.

The new law aspect of *Proffitt* arises from the court's resolution of the question of "[w]hether the right to cross-examine adverse witnesses extends to capital sentencing proceedings." 685 F.2d at 1253. The court extended the cross-examination principles of *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970); *Douglas v. Alabama,* 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965) to the penalty phase of capital proceedings. As we concluded with respect to the *Estelle v. Smith* claim, the failure of Moore and his counsel in 1978 to anticipate this extension does not render the omission of the claim from the first petition an abuse of the writ. Accordingly we reverse the district court's dismissal of the *Proffitt* claim on abuse grounds and remand for reconsideration of the merits of the claim.

## III. The *Gardner v. Florida* claim

The second federal petition alleged that neither Moore nor his counsel had been given a meaningful opportunity to review, correct, or supplement the presentence report, in violation of *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393

(1977). *Gardner* was decided in 1977; therefore this is not a claim based on alleged "new law" declared since the first federal petition.

This claim comes to us with an unusual procedural history. It was originally raised in Moore's first state habeas corpus petition in 1978. The first federal petition, filed in the fall of 1978, did not include this claim. Moore sought to raise the claim by amendment to the petition in October 1980, just after he retained new counsel. The district court refused to grant leave to amend the petition, and the Eleventh Circuit affirmed:

> The district court found that petitioner had been represented by counsel at all times. Counsel explicitly referred to this issue in the original habeas petition filed approximately two years before the proposed amendment. We cannot say that the district court abused its discretion in denying the proposed amendment in this case where counsel apparently considered and rejected the proposed arguments two years before filing the proposed amendment.[15]

[15] Mr. James C. Bonner who had represented petitioner at the prior state habeas petition, filed the initial habeas petition in federal court. At the time the proposed amendment was filed, Ms. H. Diana Hicks represented Moore. Since Moore was represented at all times by counsel, though not by the same individual, we cannot say that the district court abused its discretion in refusing to. allow the amendment....

716 F.2d at 1527 & n. 15. Moore raised the issue again in his second federal petition, and the district court denied the claim as an abuse of the writ. 734 F.2d at 598 (district court opinion).

Rule 9(b) creates two categories of claims in second (or successive) habeas petitions. The first prong concerns cases in which the same ground has previously been presented and decided against petitioner in a prior determination on the merits. Moore's claim of inadequate opportunity to review the presentence report was never determined on the merits. It is therefore a second prong, or new, claim that must be entertained on the merits unless the failure to raise it in the first petition was an abuse of the writ.

Moore argues that the failure to raise this claim in the first petition cannot be an abuse of the writ in light of Moore's attempt to add the claim by amendment. Although Moore did attempt to raise this claim before the first federal habeas court, the procedural insufficiency of that attempt has already been litigated, before that court on a motion to amend the petition and before this court on Moore's cross-appeal of the denial of the motion to amend. 716 F.2d at 1527. We are thus called upon to determine the effect on a second federal habeas corpus petition of a failure to raise a claim adequately on the first petition. On the one hand, the denial of leave to amend cannot stand as a conclusive determination that the failure to raise the claim in the first petition was an abuse of the writ, because the standards applied by a district court in considering amendment are not coterminous with the standards for abuse of the writ. *Cf. Paprskar v. Estelle*, 612 F.2d 1003 (5th Cir.), *cert. denied*, 449 U.S. 885, 101 S.Ct. 239, 66 L.Ed.2d 111 (1980) (dismissal of unexhausted claims in first petition does not bar as an abuse the assertion of those claims on a second petition). On the other hand, the mere attempt to raise the claim by amendment in one habeas proceeding cannot by itself be a defense to an assertion of abuse in a subsequent proceeding. It would be anomalous if a petitioner who deliberately and strategically withheld a claim from his petition, *cf. Young v. Kemp*, 758 F.2d 514, 516 (11th Cir.1985), could insulate that conduct from a later abuse determination by the simple expedient of an untimely attempt to amend the first petition. This result would frustrate Rule 9(b)'s goal of having all claims raised and determined in one petition.

The fact that Moore's *Gardner* claim was included in a proposed amendment to a first petition and that the amendment was properly denied is at most a factor to be considered in answering the question of whether that claim may be denied in this petition on abuse of the writ grounds. The appropriate inquiry in the subsequent action is whether the failure to bring the

claim properly in the first action constituted an abuse of the writ.

■ We cannot say that the district court, in ruling on Moore's second petition, erred in finding that the failure to include this claim in the first petition was an abuse of the writ.[13] Moore raised the claim in his first state habeas petition, *see* 734 F.2d at 597 (district court opinion), and his original federal habeas petition made explicit reference to the presentence report issue. *See Moore v. Balkcom,* 716 F.2d 1511, 1527 (11th Cir.1983). He failed even to attempt to raise the claim for almost two years after the first petition was filed. This extended failure to raise a claim previously raised in the state courts is analogous to the situation in *Antone v. Dugger,* 465 U.S. 200, 104 S.Ct. 962, 79 L.Ed.2d 147 (1984) (per curiam). In that case the Supreme Court upheld a finding of abuse where the "applicant had presented each of these claims to the state courts before the first petition for habeas was filed (and, indeed, the substance of these claims may have been presented in the first habeas petition).... " *Id.* at 206, 104 S.Ct. at 965.

Even where abuse is found, however, a federal court should not dismiss, under Rule 9, a claim in a successive petition if the "ends of justice" require consideration of the claim on the merits. *See Potts v. Zant,* 638 F.2d 727, 751–52 (5th Cir. Unit B), *cert. denied,* 454 U.S. 877, 102 S.Ct. 357, 70 L.Ed.2d 187 (1981); *Sanders v. U.S.,* 373 U.S. 1, 18–19, 83 S.Ct. 1068, 1078–79, 10 L.Ed.2d 148 (1963). The district court in *Moore* acknowledged this principle, noting that "[w]here the interests of justice so require, such a claim should be entertained," 734 F.2d at 597. The court apparently concluded, however, that the ends of justice did not require a consideration of Moore's *Gardner* claim on the merits because petitioner had had "repeated opportunities to litigate this issue." *Id.*

■ It is not certain what standards should guide a district court in determining whether the "ends of justice" require the consideration on the merits of an otherwise dismissable successive habeas petition. In *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986), a four-justice plurality of the Supreme Court suggested that the ends of justice will demand consideration of the merits of claims only where there is "a colorable showing of factual innocence." *Id.* at 2627. We need not decide at this time whether a colorable showing of factual innocence is a necessary condition for the application of the ends of justice exception. We merely hold that, at a minimum, the ends of justice will demand consideration of the merits of a claim on a successive petition where there is a colorable showing of factual innocence.

Some adjustment is required to apply this test, phrased as it is in terms of "innocence," to alleged constitutional errors in capital sentencing. We find some guidance in the Supreme Court's opinion in *Smith v. Murray,* 477 U.S. 527, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986). In the context of alleged errors in a capital sentencing proceeding the Court in that case sought to apply an analogous standard—that governing when fundamental principles of justice would require the consideration of procedurally defaulted claims in the absence of a showing of cause for the default. The standard was announced in *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) which held that "where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Id.* at 2650.

The *Smith v. Murray* Court refused to consider a claim on the merits, finding that "the alleged constitutional error neither precluded the development of true facts nor resulted in the admission of false ones.

---

**13.** The district court stated that

Because Petitioner himself could have raised the claim on direct appeal to the Georgia Supreme Court, because he did raise it in his first state habeas petition, and because he

failed to properly present the issues in his federal petition, this Court is warranted under the "abuse of the writ" doctrine to deny [this] claim.

734 F.2d at 598 (district court opinion).

Thus, even assuming [error in the allowance of certain testimony], its admission did not serve to pervert the jury's deliberations concerning whether *in fact* petitioner constituted a continuing threat to society." 106 S.Ct. at 2668.

 The district court in the present case did not have available to it the guidance given by the Supreme Court in *Smith v. Murray*. In our consideration of whether "the alleged constitutional error [either] precluded the development of true facts [or] resulted in the admission of false ones" we are faced with a fundamental inconsistency in the decision of the district court. The court found that the ends of justice did not require consideration of the *Gardner* claim on the merits. Yet its own statements arguably require the opposite finding. The court stated that if there had been a *Gardner* violation, "then sufficient likelihood would exist for finding that a wrongful sentence was imposed based on inadequate information." The court also found that "it is arguable that the corrected information 'would [not] barely have altered the sentencing profile presented to the sentencing judge,'" that is, that corrected information would have materially altered the profile before the judge. 734 F.2d at 597 (*quoting Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Under these circumstances we vacate the denial of the *Gardner* claim and remand in order that the district court can give fresh consideration to whether the ends of justice require it to consider the merits of this claim.

### IV. Ineffectiveness of trial counsel

 Moore's second federal habeas petition alleges that his trial attorney rendered ineffective assistance at the sentencing phase of his trial. By a *pro se* motion to amend his first habeas petition, Moore attempted to raise the issue of ineffectiveness of counsel at the merits trial in numerous respects, set out in the margin.[14] The only reference to the sentencing phase concerned failure to transcribe petitioner's arguments concerning punishment and mitigation and aggravating circumstances.

In the second federal petition Moore alleged ineffective counsel at sentencing, on numerous grounds. Moore urges that he did not withhold the issue, stating that it was omitted from the first federal petition because of differences between him and his counsel. The ineffectiveness issue, including the performance of counsel at the sentencing phase, had been examined in detail in the order denying the first state petition. Ineffectiveness at sentencing was not asserted in petitioner's *pro se* amendment or in the Hicks amendment. The court did not err in finding that it was barred under abuse of the writ principles.

### V. Racially discriminatory application of death penalty in Georgia

This claim was not raised in the first state petition or the first federal petition. Petitioner has sought the benefit of the Baldus study. The district court held it was barred on abuse grounds. We do not examine this in detail because the Baldus study was rejected in *McCleskey v. Kemp*, — U.S. ——, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

AFFIRMED in part, REVERSED in part and REMANDED.

TJOFLAT, Circuit Judge, concurring in part and dissenting in part, in which VANCE, Circuit Judge, joins:

This case comes before the en banc court as an appeal from the district court's decision to deny petitioner, William Neal Moore, a writ of habeas corpus. As the majority opinion notes, the principal issue

---

**14.** (1) Counsel's failure to investigate and challenge the composition of the grand jury; (2) failure to inform petitioner that he could challenge the composition of the grand jury; (3) failure to investigate prejudice in the county of trial and to seek a change of venue; (4) failure to request that the district attorney's closing arguments be transcribed; (5) use by the Geor-

gia Supreme Court of unconstitutional cases in its appellate review; and (6) failure to follow up on investigation of the offense.

As with the proposed Hicks amendment discussed in the previous section, the first federal habeas court denied the motion to amend. See 513 F.Supp. at 806.

before the court is whether the district court properly rejected Moore's petition as an abuse of the writ under Rule 9(b) of the Rules Governing Section 2254 Cases, *see* 28 U.S.C. § 2254 (1982). The majority holds that Moore's failure to present his claims based on *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), and *Proffitt v. Wainwright*, 685 F.2d 1227 (11th Cir.1982), *modified*, 706 F.2d 311 (11th Cir.), *cert. denied*, 464 U.S. 1002, 104 S.Ct. 508, 78 L.Ed.2d 697 (1983), did not constitute an abuse of the writ, because *Estelle v. Smith* and *Proffitt* are "new law." I respectfully dissent from these conclusions because a reasonably competent habeas attorney should have anticipated the holdings of *Estelle v. Smith* and *Proffitt.* I also dissent from the majority's disposition of petitioner's claim under *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (plurality), because Moore had a sufficient opportunity to present this claim in his first petition and because it is patently without merit. Finally, I concur in the majority's analysis and disposition of petitioner's remaining claims.[1]

## I.

On May 13, 1974, a grand jury in Jefferson County, Georgia, indicted Moore for the April 2, 1974 malice murder and armed robbery of Fredger Stapleton.[2] On June 4, 1974, Moore was arraigned in the Superior Court of Jefferson County and pled guilty to both charges. Because the State sought the death penalty on the malice murder charge, Moore was entitled, under Georgia law, to have a jury determine whether that penalty, or a sentence of life imprisonment, should be imposed. He waived his right to a jury determination, electing instead to be sentenced by the court.

On July 17, 1974, the court held a bench trial on the penalty issue. From the evidence adduced by the prosecution and the defense (including ·a presentence report, prepared by the court's probation officer which the prosecutor had introduced into evidence without objection) the court found that Moore had committed the Stapleton murder during the course of an armed robbery, an aggravating circumstance that rendered Moore subject to the death penalty.[3] The court further found that this aggravating circumstance outweighed the mitigating circumstances present in the case, and it sentenced Moore to death.

On direct appeal, the Supreme Court of Georgia affirmed Moore's conviction and sentence. *Moore v. State*, 233 Ga. 861, 213 S.E.2d 829 (1975) (per curiam), *cert. denied*, 428 U.S. 910, 96 S.Ct. 3222, 49 L.Ed.2d 1218 (1976). Moore thereafter moved the Superior Court of Jefferson County for a new sentencing proceeding. The court denied his motion. *See Moore v. State*, 239 Ga. 67, 235 S.E.2d 519, *cert. denied*, 434 U.S. 878, 98 S.Ct. 232, 54 L.Ed.2d 159 (1977).[4] In early 1978, Moore petitioned the Superior Court of Tattnall County, Georgia, for a writ of habeas corpus, presenting six

---

1. Petitioner's remaining claims concern the ineffectiveness of trial counsel during the sentencing phase of his case and the alleged racially discriminatory application of the death penalty in Georgia. The district court dismissed both of these claims as an abuse of the writ.

2. The facts underlying this case have been recounted elsewhere. *See, e.g., Blake v. Zant*, 513 F.Supp. 772, 803–04 (S.D.Ga.1981), *aff'd in part and rev'd in part sub nom. Moore v. Balkcom*, 716 F.2d 1511 (11th Cir.1983), *cert. denied*, 465 U.S. 1084, 104 S.Ct. 1456, 79 L.Ed.2d 773 (1984); *Moore v. State*, 233 Ga. 861, 213 S.E.2d 829, 830–31 (1975), *cert. denied*, 428 U.S. 910, 96 S.Ct. 3222, 49 L.Ed.2d 1218 (1976).

3. *See* Ga.Code Ann. § 27–2534.1(b)(2) (Harrison 1978); *see also infra* note 21.

4. Moore contended that he was entitled to a new sentencing proceeding on two grounds: (1) the court had imposed the death penalty under "a mistaken belief that such sentence would never be upheld by the U.S. Supreme Court," and (2) the court, in deciding to impose the death penalty, had relied on information (contained in the probation officer's presentence report) which Moore "had no opportunity to deny or explain" (the *Gardner* claim). *See Moore v. State*, 235 S.E.2d at 519. The Supreme Court of Georgia affirmed the trial court's denial of Moore's motion for a new sentencing proceeding on the ground that a habeas corpus action was the sole avenue for such relief. *Id.*

grounds for relief.[5] After an evidentiary hearing, that court rejected his petition, and the Supreme Court of Georgia refused to grant him a certificate of probable cause to appeal.

On November 22, 1978, Moore sought a writ of habeas corpus in the United States District Court for the Southern District of Georgia.[6] His petition contained four of the six claims he had asserted in his state habeas petition;[7] one of the claims Moore omitted was his *Gardner* claim—that his trial judge did not give him and his attorney an adequate opportunity to review, supplement, or correct the probation officer's presentence report before sentencing him to death. On March 6, 1979, while his petition was pending in the district court, Moore filed a pro se motion to amend his petition to add two claims not pertinent to this appeal.[8]

Moore's attorney, James C. Bonner, Jr., who had represented Moore in the state habeas court, thereafter requested and received leave to withdraw, and the district court appointed H. Diana Hicks as substitute counsel. Hicks immediately moved the court for leave to amend Moore's peti-

tion, to present his *Gardner* claim.[9] On April 29, 1981, the district court denied both the pro se motion and the Hicks motion for leave to amend, *see Blake v. Zant*, 513 F.Supp. 772, 804–06 (S.D.Ga.1981); granted the writ as to Moore's sentence on the ground that "the penalty of death is cruel and unusual as applied to him in light of the circumstances of the crime and other relevant factors," *id* at 803; and denied all of Moore's remaining claims, *id.*

The State appealed the district court's judgment granting the writ as to Moore's sentence, and Moore cross-appealed, challenging the district court's rulings on the claims that the district court rejected and the court's refusal to permit him to amend his petition. A panel of this court reversed the grant of relief, concluding that the district court had improperly engaged in a proportionality review of Moore's sentence, *Moore v. Balkcom*, 716 F.2d 1511, 1518–19 (11th Cir.1983) (on rehearing), and affirmed the district court's rejection of his remaining challenges to his guilty pleas and death sentence, *id.* at 1527. The panel also held that the district court did not abuse its

---

5. In his habeas petition, Moore claimed that his conviction and sentence violated the eighth amendment proscription against cruel and unusual punishment and the due process clause of the fourteenth amendment for the following reasons: (1) his prior arrest record was presented to the sentencing judge in a presentence report "without the Petitioner or his counsel being afforded a fair opportunity to explain or rebut it" (the *Gardner* claim); (2) his direct appeal to the Supreme Court of Georgia was not properly conducted, because the prosecutor's arguments at the close of the sentencing proceeding were not transcribed and included in the record on appeal; (3) a brutal murder of an elderly couple in rural Jefferson County that occurred shortly before Moore was indicted improperly influenced the district attorney and the trial judge in Moore's case; (4) his guilty plea to malice murder was involuntary and unintelligent because he lacked specific intent to kill his victim; (5) his sentence was disproportionate, given the mitigating circumstances present in his case; and (6) he never voluntarily waived his absolute right under Georgia law, *see* Ga. Code Ann. § 27–1404 (1933) (current version at Ga.Code Ann. § 17–7–93 (1982)), to withdraw his two guilty pleas prior to the court's entry of judgment against him.

6. The discussion in the text omits reference to a federal habeas petition that Moore filed earlier

in 1978 and then voluntarily dismissed without prejudice after the Supreme Court of Georgia granted a stay of his execution. That aborted petition has no relevance to this appeal.

7. Moore's federal petition contained claims two, four, five, and six of his state habeas petition. *See supra* note 5. Although his federal petition recited the facts underpinning claim one of his state habeas petition (the *Gardner* claim), it did not present that claim as a ground for relief.

8. Moore's pro se amendment alleged that his trial attorney provided him ineffective assistance of counsel because he (1) failed to investigate and challenge the composition of Moore's grand jury; (2) failed to inform Moore that he could challenge the grand jury; (3) failed to seek a change of venue for Moore's trial; and (4) failed to request that counsel's closing arguments to the sentencing judge be transcribed for review on appeal. Moore also alleged that the Supreme Court of Georgia relied on "[u]nconstitutional cases ... in compari[ng his] death sentence [to prior cases]."

9. Hicks' proposed amendment, which was filed on October 1, 1980, included still other claims not relevant to this appeal.

discretion in refusing to grant Moore leave to amend his petition. *Id.* The Supreme Court denied Moore's petition for a writ of certiorari. *Moore v. Balkcom,* 465 U.S. 1084, 104 S.Ct. 1456, 79 L.Ed.2d 773 (1984).

Moore thereafter returned to state court for relief, seeking a writ of habeas corpus in the Superior Court of Butts County, Georgia. His petition contained seven claims. Moore alleged that (1) the State infringed his rights under the fifth, sixth, and fourteenth amendments when his trial judge, in deciding whether to impose the death sentence, relied on a presentence report that contained information the court's probation officer had obtained from Moore without advising him of his rights not to submit to a presentence interview and to have counsel present during the interview (the *Estelle v. Smith* claim);[10] (2) the presentence report contained inaccurate and incomplete information, in violation of *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); (3) he was denied his sixth and fourteenth amendment rights to confront the witnesses whose testimony was contained in the presentence report (the *Proffitt* claim); (4) because of the errors and omissions contained in the presentence report, he was denied the right to meaningful appellate review, in violation of *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); (5) because he lacked the specific intent to kill his victim, he was sentenced to death in violation of *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); (6) the death penalty in Georgia was being administered in a racially discriminatory manner; and (7) his trial counsel provided him ineffective assistance during the sentencing phase of his case. The superior court rejected each of Moore's claims. The court rejected the *Enmund* and ineffective assistance of counsel claims because they had been fully litigated in Moore's first state habeas proceeding and Moore gave no reason why they should be relitigated. The court held that Moore had waived his remaining claims by failing to raise them during that first proceeding. *See* Ga.Code Ann. § 9–14–51 (1982). On May 18, 1984, the Supreme Court of Georgia denied Moore's application for a certificate of probable cause to appeal.

Moore then filed his second federal habeas petition, the one now before us, presenting the seven claims he asserted in his second state habeas petition. Moore alleged that these claims were based on newly discovered facts (the sixth claim) or novel legal principles (the six remaining claims) that were not available when he brought his first federal habeas petition. Moore also presented his *Gardner* claim, which he had raised in his previous federal habeas proceeding in a motion for leave to amend his petition.

On May 22, 1984, the district court entered a memorandum order dismissing Moore's petition and denying a certificate of probable cause. Except for the *Enmund* claim,[11] the court held that the delayed presentation of Moore's claims constituted an abuse of the writ; contrary to Moore's contention, they were neither based on newly discovered facts nor on new constitutional doctrine, and he gave no lawful reason why he should not have asserted them in his previous petition. Adopting the district court's memorandum order in full, a divided panel of this court affirmed the decision. *Moore v. Zant,* 734 F.2d 585 (11th Cir.1984) (per curiam).

## II.

The doors of the federal courts must always remain open to state prisoners seek-

---

**10.** The *Estelle v. Smith* claim actually consists of two claims, one based on the fifth and fourteenth amendments and another based on the sixth and fourteenth amendments. Throughout this opinion, I frequently refer to these claims as the *Estelle v. Smith* claim and, for convenience, omit reference to the fourteenth amendment.

**11.** The district court, observing that it had rejected the *Enmund* claim on the merits in Moore's previous federal habeas proceeding, held that the claim was meritless and that the ends of justice did not require its relitigation.

ing to bring constitutional challenges to the propriety of their confinement. *See Sanders v. United States,* 373 U.S. 1, 7–8, 83 S.Ct. 1068, 1072–73, 10 L.Ed.2d 148 (1963); *cf. Fay v. Noia,* 372 U.S. 391, 402, 83 S.Ct. 822, 829, 9 L.Ed.2d 837 (1963) ("[G]overnment must always be accountable to the judiciary for a man's imprisonment...."). For this reason, the doctrine of res judicata does not apply to bar successive petitions for habeas corpus relief. *Sanders,* 373 U.S. at 7, 83 S.Ct. at 1072.[12] Habeas corpus is, however, grounded in principles of equity. Accordingly, in deciding whether to entertain the merits of a claim contained in a successive petition, the court must consider the diligence with which the petitioner has pursued the claim. Depending upon the circumstances, a petitioner's lack of diligence may operate as a bar to relief. *Id.* at 17, 83 S.Ct. at 1078 (" '[A] suitor's conduct in relation to the matter at hand may disentitle him to the relief he seeks.' ") (citation omitted).

The Supreme Court expounded upon this equitable principle in *Sanders* and articulated the standard a trial judge should apply in deciding whether to consider the merits of a claim that the petitioner failed to prosecute in an earlier habeas proceeding. The judge must consider the "new" claim on the merits, unless the petitioner's delay in presenting it constitutes an abuse of the writ. *Id.* at 17, 83 S.Ct. at 1078. For example, the court may deem the petitioner to have waived the claim if, after raising it in a prior habeas petition, he abandoned the claim during his prosecution of that petition. Similarly, it may hold that the petitioner waived the claim if he deliberately withheld it from his prior petition with the expectation of presenting it in a subsequent petition. *Id.* at 18, 83 S.Ct. at 1078. As the Court noted in *Sanders,* these equitable bars to prosecution are unexceptionable because "[n]othing in the traditions of habeas corpus requires the federal courts to tolerate needless piecemeal litigation, to entertain collateral proceedings whose only purpose is to vex, harass, or delay." *Id.* at 18, 83 S.Ct. at 1078.[13]

---

**12.** Even though the federal courts may have previously rejected the petitioner's claim on the merits, a habeas judge will entertain it if the petitioner establishes that the ends of justice would be served by relitigation of the claim. *Sanders,* 373 U.S. at 16, 83 S.Ct. at 1078. The *Sanders* Court elaborated on this "ends of justice" test as follows:

> If factual issues are involved, the applicant is entitled to a new hearing upon showing that the evidentiary hearing on the prior application was not full and fair.... If purely legal questions are involved, the applicant may be entitled to a new hearing upon showing an intervening change in the law or some other justification for having failed to raise a crucial point or argument in the prior application. Two further points should be noted. *First,* the foregoing enumeration is not intended to be exhaustive; the test is "the ends of justice" and it cannot be too finely particularized. *Second,* the burden is on the applicant to show that, although the ground of the new application was determined against him on the merits on a prior application, the ends of justice would be served by a redetermination of the ground.

*Id.* at 16–17, 83 S.Ct. at 1078 (citation omitted). For further discussion of the standard applicable to successive petitions, see *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986). Although *Sanders* involved habeas corpus relief for federal prisoners, its standards apply to habeas corpus cases brought by state prisoners.

**13.** Congress codified the general principles of *Sanders* in Rule 9(b) of the Rules Governing Section 2254 Cases (hereinafter Rule 9(b)), *see* 28 U.S.C. § 2254 (1982); *see also* 28 U.S.C. § 2244(b) (1982). Rule 9(b) provides as follows:

> A second or successive petition may be dismissed if the judge finds that it fails to allege new or different grounds for relief and the prior determination was on the merits or, if new and different grounds are alleged, the judge finds that the failure of the petitioner to assert those grounds in a prior petition constituted an abuse of the writ.

The initial burden of pleading an abuse of the writ under Rule 9(b) rests on the state, *see Sanders,* 373 U.S. at 17, 83 S.Ct. at 1078; *Price v. Johnston,* 334 U.S. 266, 292, 68 S.Ct. 1049, 1063, 92 L.Ed. 1356 (1948), although a district court may raise the issue *sua sponte, see Jones v. Estelle,* 722 F.2d 159, 164 (5th Cir.1983) (en banc), *cert. denied,* 466 U.S. 976, 104 S.Ct. 2356, 80 L.Ed.2d 829 (1984). Once the abuse of the writ issue has been raised, the petitioner "has the burden of answering that allegation and of proving that he has not abused the writ." *Price,* 334 U.S. at 292, 68 S.Ct. at 1063; *see also Funchess v. Wainwright,* 788 F.2d 1443, 1445 (11th Cir.1986) (per curiam); *Jones v. Estelle,* 722 F.2d at 164. As the Supreme Court noted in *Sanders,*

A petitioner may also be denied relief even though he did not deliberately bypass an opportunity to litigate his claim in the prior habeas proceeding. The court may refuse to litigate his claim on the merits if it finds that his failure to raise it in the prior proceeding was the result of "inexcusable neglect." [14] *See Paprskar v. Estelle*, 612 F.2d 1003, 1006 (5th Cir.), *cert. denied*, 449 U.S. 885, 101 S.Ct. 239, 66 L.Ed.2d 111 (1980); [15] *see also Funchess v. Wainwright*, 788 F.2d 1443, 1445 (11th Cir. 1986) (per curiam); *Stephens v. Kemp*, 721 F.2d 1300, 1303 (11th Cir.1983) (per curiam), *cert. denied*, 469 U.S. 1043, 105 S.Ct. 530, 83 L.Ed.2d 417 (1984); *Potts v. Zant*, 638 F.2d 727, 741 (5th Cir. Unit B Feb. 1981), *cert. denied*, 454 U.S. 877, 102 S.Ct. 357, 70 L.Ed.2d 187 (1981); *Haley v. Es-*

*telle*, 632 F.2d 1273, 1275 (5th Cir. Unit A 1980). Once the state contends that the petitioner's delayed presentation of his claim constitutes an abuse of the writ, the petitioner has the burden of satisfying the habeas judge that the delay is excusable. The sufficiency of the petitioner's explanation is a matter committed to the judge's sound discretion. *See supra* note 13.

Whether a petitioner's failure to assert his claim in an earlier habeas proceeding is excusable will depend, of course, on the reasonableness of his conduct under the circumstances. For example, the court may deem a pro se petitioner to have waived his claim if it can be said that a reasonable person standing in his shoes could have brought the claim. [16] *See Price*

---

"[t]he principles [for determining an abuse of the writ] are addressed to the sound discretion of the federal trial judges. Theirs is the major responsibility for the just and sound administration of the federal collateral remedies, and theirs must be the judgment as to whether a second or successive application shall be denied without consideration of the merits." *Sanders,* 373 U.S. at 18, 83 S.Ct. at 1079; *see also Jones v. Estelle,* 722 F.2d at 165.

**14.** Equity has never countenanced contumacious conduct. Thus, a federal court will not entertain a claim that the petitioner deliberately withheld—or, if asserted, deliberately withdrew—with the idea of bringing it later if his attempt to obtain habeas relief is unsuccessful. Nor will equity countenance inexcusable neglect. If the petitioner possessed the ingredients of his claim (the facts and the law) but simply neglected to bring it in his prior petition, a federal court, pursuant to Rule 9(b), may decline to consider the claim. There are sound policy reasons for this rule: (1) the need for finality of state court convictions; (2) the need to aid enforcement of state procedural rules barring the consideration on the merits of claims not seasonably presented (when the state has declined to decide the claim on the merits because of petitioner's procedural default); (3) the federal courts constitute a scarce resource and thus piecemeal litigation, which needlessly taxes the courts' dockets and prevents other litigants from having a speedy determination of their claims, should be avoided; and (4) federal court consideration of successive petitions harasses the state. *See Haley v. Estelle,* 632 F.2d 1273, 1276 (5th Cir. Unit A 1980) ("Rule 9(b) was intended to eliminate the repetition of identical claims and the prolongation of litigation by the presentation of claims in a piecemeal fashion."); Rule 9(b) advisory committee's note ("This subdivison is aimed at screening out the abusive petitions from [the] large volume [of

second petitions], so that the more meritorious petitions can get quicker and fuller consideration.").

**15.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

**16.** Arguably, a petitioner could be considered as having proceeded pro se in his previous habeas action if his counsel performed so ineptly as to have effectively rendered him without counsel. In this case, Moore does not contend, or even suggest, that his prior habeas counsel were inept.

In a case in which counsel prosecuted the petitioner's first habeas petition so ineptly that the petitioner could be considered as having proceeded pro se, the petitioner may have little difficulty in demonstrating that his failure to include a particular claim in his first petition was justified or excusable in the circumstances. I do not, however, endorse the majority's attempt to engraft analysis of ineffective assistance of counsel, in the sixth amendment sense, into the doctrine of abuse of the writ. In the majority's view, for example, Moore did not abuse the Great Writ when he failed to present his *Estelle v. Smith* claim in his first federal habeas petition, because "[a]n attorney's failure in 1978 to recognize the potential intersection of *Miranda* and Georgia capital sentencing proceedings, does not cause his performance to fall outside of 'the wide range of professionally competent assistance.'" *Ante* at 854 (quoting *Strickland v. Washington,* 466 U.S. 668, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984)).

This approach emasculates the doctrine of abuse of the writ because the failure to include

*v. Johnston,* 334 U.S. 266, 292, 68 S.Ct. 1049, 1063, 92 L.Ed. 1356 (1948); *Booker v. Wainwright,* 764 F.2d 1371, 1376–78 (11th Cir.) (quoting *Mays v. Balkcom,* 631 F.2d 48, 51 (5th Cir.1980)), *cert. denied,* 474 U.S. 975, 106 S.Ct. 339, 88 L.Ed.2d 324 (1985); *Haley,* 632 F.2d at 1275–76. A petitioner represented by counsel, on the other hand, may be deemed to have waived his claim if a reasonably competent attorney could have recognized and prosecuted the claim. *See Jones v. Estelle,* 722 F.2d 159, 167 (5th Cir.1983) (en banc) ("Given [the] elemental role of counsel in our adversary system, we think it inevitable that the inquiry into excuse for omitting a claim from an earlier writ will differ depending on whether petitioner was represented by counsel in the earlier writ prosecution."), *cert. denied,* 466 U.S. 976, 104 S.Ct. 2356, 80 L.Ed.2d 829 (1984); *see also Hamilton v. McCotter,* 772 F.2d 171, 178–80 (5th Cir.1985). In sum, if a petitioner fails to prosecute a claim when its factual and legal bases are present, two inferences are permissible: either he is deliberately withholding the claim, perhaps with the idea of asserting it in a subsequent petition, or he is simply neglecting to pursue it.

In this case, the State contends that Moore's failure to assert in his first petition the claims now before us was inexcus-

a claim will almost always be excused. It will be excused under either of two theories, one of which will apply in nearly every case. The first excuse is that petitioner's previous habeas attorney was ineffective; the attorney should have prosecuted the omitted claim—its legal basis being readily available—but failed to do so because of his incompetence. This incompetence, in turn, effectively rendered petitioner without counsel. Thus, in deciding whether inexcusable neglect should preclude petitioner from litigating the omitted claim in the successive petition, the district court must treat petitioner's prior omission as that of a pro se litigant. Under the relaxed standard applicable to such litigants, the court will probably allow the petitioner to litigate his claim on the merits.

The rationale for the second excuse, contrary to that of the first excuse, assumes that the petitioner's previous habeas attorney was not ineffective; the attorney failed to prosecute the omitted claim because its legal basis was unavailable. Under these circumstances, the court will entertain the claim because it is based on "new law."

Following the majority's approach, a wise petitioner will assert both theories, alternatively, in response to the state's contention that his failure to present the omitted claim earlier is inexcusable. If the petitioner satisfies the court, as Moore has satisfied the majority in this case, that his claim is founded on new law, the court must adjudicate his claim on the merits. If he fails to convince the court that his theory of relief is new—because the theory was extant at the time of the previous habeas proceeding— then, petitioner will argue, the court must find that his attorney was "ineffective." In either case the result is the same: the court entertains the claim on the merits. The concept of inexcusable neglect ceases to exist.

The majority's approach to abuse of the writ analysis defies logic. It also lacks any support from precedent or policy. First, there is no constitutional right to effective assistance of counsel in habeas corpus proceedings. *See* U.S. Const. amend. VI (*"In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence."*) (emphasis added); *see also Daniels v. Blackburn,* 763 F.2d 705, 710 (5th Cir.1985) (per curiam) ("[T]here is no constitutional right to the assistance of counsel in a collateral attack on a conviction."); *Williams v. Missouri,* 640 F.2d 140, 144 (8th Cir.), *cert. denied,* 451 U.S. 990, 101 S.Ct. 2328, 68 L.Ed.2d 849 (1981) ("[Habeas corpus proceedings] are civil proceedings not covered by the Sixth Amendment which applies only during the pendency of the criminal case."); *Ganz v. Bensinger,* 480 F.2d 88, 89 (7th Cir.1973) (sixth amendment inapplicable outside the context of criminal trial); *see also Pennsylvania v. Finley,* —— U.S. ——, ——, 107 S.Ct. 1990, 1993, 95 L.Ed.2d 539 (1987) (no right to counsel on collateral attack).

Second, the policies of federal habeas corpus do not require that a habeas counsel's "ineffectiveness" excuse the petitioner's failure to present a claim in a timely manner. The petitioner has an obvious interest in the just resolution of his constitutional claims, but he does not have a constitutionally guaranteed right to effective habeas counsel. Countervailing considerations—such as finality of conviction, deterring counsel's sandbagging of established claims, and the doctrine that a habeas petitioner must be held accountable for the actions of his attorney—outweigh the petitioner's interest, assuming, at least, that his counsel was not so ineffective as to render his presence in the case irrelevant. Indeed, if attorney ineffectiveness constitutes an excuse for Rule 9(b) purposes, the only deterrent to the piecemeal litigation of claims will be counsel's self-interest in avoiding a charge, brought by the lawyer prosecuting the petitioner's successive petition, that he was professionally incompetent.

Finally, inherent in the "inexcusable neglect" standard is the notion that lawyer negligence is not a ground for excusing the failure to present a constitutional claim in a timely fashion.

able. The State notes that Moore was represented by counsel throughout his collateral attacks on his convictions and death sentence, that there are no newly discovered facts in Moore's case—the facts supporting each of his claims being well known at the time he brought his first petition—and that the federal constitutional implications of those facts were plainly discernable from the relevant case law. Moore acknowledges that there are no newly discovered facts; his disagreement with the State, the district court, and the panel concerns the legal significance of the facts.[17] Moore contends that a reasonably competent lawyer, standing in the shoes of his previous habeas counsel, did not have the tools to fashion the constitutional claims, explicitly recognized in *Estelle v. Smith* and *Proffitt*, concerning the sentencing court's receipt into evidence of the probation officer's presentence report. Moore submits that this contention, if true, constitutes a lawful excuse, which the district court and panel should have accepted as a matter of law, for the delayed assertion of these constitutional claims.

I disagree with Moore's basic premise regarding what a reasonably competent lawyer should have recognized at the time of Moore's first federal habeas petition. At the time Moore filed that petition, there was ample precedent for the constitutional objections Moore now makes. This point becomes clear when one analyzes the Georgia capital sentencing scheme, as it existed at the time of Moore's sentencing proceeding; the procedures that the court, the prosecutor, and defense counsel followed in conducting that proceeding; and the constitutional precedent available to Moore when he first sought federal habeas relief. Accordingly, I find no abuse of discretion in the district court's refusal to entertain the merits of the claims in question.

17. Moore's disagreement with the State on the "new law" point concerns his *Estelle v. Smith* and *Proffitt* claims. I discuss the parties' dispute over Moore's *Gardner* claim in Part VI *infra*.

18. Moore's failure to object at the sentencing hearing may constitute a procedural default. *See Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct.

### III.

Moore presents two "new law" claims in his current habeas petition. The first claim, based on *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), is that the State failed to inform him of his right to remain silent and of his right to consult with counsel prior to the probation officer's presentence interview of him, in violation of the fifth, sixth, and fourteenth amendments. The second claim, based on *Proffitt v. Wainwright,* 685 F.2d 1227 (11th Cir.1982), *modified,* 706 F.2d 311 (11th Cir.), *cert. denied,* 464 U.S. 1002, 104 S.Ct. 508, 78 L.Ed.2d 697 (1983), is that the sentencing judge denied him the right to confront and cross-examine the witnesses upon whose statements the probation officer based his presentence report. To determine whether a reasonable lawyer should have recognized these claims when Moore filed his first federal habeas petition, it is necessary to appreciate the factual context in which they arose. I therefore begin my analysis with an examination of the Georgia death penalty scheme and the manner in which the trial court, the prosecution, and the defense conducted Moore's sentencing proceeding. In discussing Moore's claims, we must be aware that his defense counsel did not present them to the sentencing court when given the opportunity to do so; that is, the presentence report, which Moore now contends was prepared and introduced into evidence in violation of the Constitution, was admitted into evidence without objection during an adversary proceeding.[18]

### A.

The Georgia capital sentencing law, as it existed in 1974, was much the same as it is today.[19] The Georgia legislature enacted

2497, 53 L.Ed.2d 594 (1977). This issue is, however, not before the court.

19. The statutory citations in Part III of my opinion are to the provisions that were in effect at the time of Moore's trial in 1974. These provisions continue in force with few substantive changes, none of which are relevant here.

this law in light of the Supreme Court's decision in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), which struck down Georgia's previous death penalty statute. *See* 1974 Ga.Laws 352 (codified as amended in scattered sections of the Georgia Code); 1973 Ga.Code 159 (codified as amended in scattered sections of the Georgia Code). The new law provided for a bifurcated capital trial. The first part of the trial concerned the defendant's guilt or innocence. The second part concerned the sentence to be imposed: death or life imprisonment.[20] *See* Ga.Code Ann. § 27-2503(b) (Harrison 1978). As in the case of the guilt phase of the trial, the defendant in the sentencing phase was entitled to a jury proceeding. *See id.* The defendant could, however, waive his right to a jury in either phase of the case and elect to proceed before the trial judge.

In seeking capital punishment, the state had the burden of proving beyond a reasonable doubt that the defendant's case was eligible for the death penalty by establishing one or more of ten statutory aggravating circumstances.[21] *Id.* § 26-3102;[22] *id.* § 27-2534.1(b), (c); *see Gregg v. Georgia,* 428 U.S. 153, 164-66, 96 S.Ct. 2909, 2921-22, 49 L.Ed.2d 859 (1976) (plurality); *see also* Ga.Code Ann. § 27-2537(c)(2) (Harrison 1978). The state could introduce only that evidence of aggravating circumstances of which it had notified the defendant before trial. *Id.* § 27-2503(a); *see also Potts v. State,* 241 Ga. 67, 243 S.E.2d 510, 522 (1978).

**20.** The Supreme Court, in *Gregg v. Georgia,* 428 U.S. 153, 163-64, 96 S.Ct. 2909, 2920-21, 49 L.Ed.2d 859 (1976) (plurality), viewed this sentencing phase as an integral part of the trial of a death penalty case.

**21.** The ten statutory aggravating circumstances enumerated in section 27-2534.1(b) were as follows:

(1) The offense of murder, rape, armed robbery, or kidnapping was committed by a person with a prior record of conviction for a capital felony, or the offense of murder was committed by a person who has a substantial history of serious assaultive criminal convictions.

(2) The offense of murder, rape, armed robbery, or kidnapping was committed while the offender was engaged in the commission of another capital felony, or aggravated battery, or the offense of murder was committed while the offender was engaged in the commission of burglary or arson in the first degree.

(3) The offender by his act of murder, armed robbery, or kidnapping knowingly created a great risk of death to more than one person in a public place by means of a weapon or device which would normally be hazardous to the lives of more than one person.

(4) The offender committed the offense of murder for himself or another, for the purpose of receiving money or any other thing of monetary value.

(5) The murder of a judicial officer, former judicial officer, district attorney or solicitor or former district attorney or solicitor during or because of the exercise of his official duty.

(6) The offender caused or directed another to commit murder or committed murder as an agent or employee of another person.

(7) The offense of murder, rape, armed robbery, or kidnapping was outrageously or wan-

tonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim.

(8) The offense of murder was committed against any peace officer, corrections employee or fireman while engaged in the performance of his official duties.

(9) The offense of murder was committed by a person in, or who has escaped from, the lawful custody of a peace officer or place of lawful confinement.

(10) The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or custody in a place of lawful confinement, of himself or another.

**22.** Section 26-3102 stated as follows:

Where, upon a trial by jury, a person is convicted of an offense which may be punishable by death, a sentence of death shall not be imposed unless the jury verdict includes a finding of at least one statutory aggravating circumstance and a recommendation that such sentence be imposed. Where a statutory aggravating circumstance is found and a recommendation of death is made, the court shall sentence the defendant to death. Where a sentence of death is not recommended by the jury, the court shall sentence the defendant to imprisonment as provided by law. Unless the jury trying the case makes a finding of at least one statutory aggravating circumstance and recommends the death sentence in its verdict, the court shall not sentence the defendant to death, provided that no such finding of statutory aggravating circumstance shall be necessary in offenses of treason or aircraft hijacking. The provisions of this section shall not affect a sentence when the case is tried without a jury or when the judge accepts a plea of guilty.

The defendant could avoid the imposition of the death penalty in any of three ways. The first was to convince the court on motion for directed verdict that the state's evidence failed to establish an aggravating circumstance.[23] The second was to convince the jury that the state failed to carry its burden of proof on that issue. Finally, the defendant could urge the jury not to impose the death penalty because of mitigating circumstances present in the case. Under Georgia law, the defendant had wide latitude in introducing mitigating evidence. *Gregg*, 428 U.S. at 164, 96 S.Ct. at 2921 (citing *Brown v. State*, 235 Ga. 644, 647–50, 220 S.E.2d 922, 925–26 (1975)).

The sentencing proceeding I have described was clearly adversarial. Like a criminal trial, it began with the prosecutor's opening statement, explaining what the state must prove and how it intended to satisfy its burden. After the defense's opening statement, which could be reserved until the close of the state's case, the prosecution presented its evidence, which the defense was entitled to cross-examine. When the state rested its case, the defense had the right to seek a directed verdict on the aggravating circumstances issue. If the court did not direct a verdict, the defense could rebut the state's evidence of aggravating circumstances and could present mitigating evidence. The state, in turn, had the right to rebut the defendant's case. At the close of all the evidence, both sides argued their case to the jury, the court instructed the jury on the law, and the jury retired to deliberate its verdict— the death sentence or life imprisonment. The trial judge then imposed the sentence in accordance with the jury's verdict. Cases tried to the court instead of to the jury followed the same procedures, except that the trial judge replaced the jury as the finder of fact and the sentencer.

### B.

Moore's 1974 sentencing hearing followed these procedures. On June 4, 1974, Moore pled guilty to the charges of malice murder and armed robbery and waived his right to jury sentencing. The court scheduled the sentencing hearing in Moore's case for July 21, 1974, and directed its probation office to prepare a presentence report.[24] Following normal procedures, Probation Officer Rachels interviewed Moore, inquiring into the circumstances of the murder and armed robbery offenses he had committed and into his background. Moore contends that Rachels violated *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), by not advising him of his rights to remain silent and to have the presence of counsel during the interview, and that Rachels violated the sixth amendment by interviewing him without notifying his attorney. For purposes of this appeal, I assume the truth of these allegations. At the same time, I note that these constitutional violations were of no consequence until Rachels' report was received into evidence and thus made available to the trial court.

At some time prior to the sentencing hearing, the prosecutor informed Moore's attorney that the state would seek the death penalty based on one aggravating circumstance—that Moore had committed the murder in question while he was engaged in the commission of armed robbery. At the sentencing hearing, the prosecutor presented the state's case as if he were establishing the defendant's guilt as well as seeking a death sentence. He called four witnesses: a medical examiner, two Georgia Bureau of Investigation agents, and the sheriff of Jefferson County, Georgia, who collectively established how Moore had committed the crimes. Moore's trial

---

**23.** The trial judge's determination as to the sufficiency of the evidence supporting the aggravating circumstances was subject to judicial review. *See* Ga.Code Ann. § 27–2537(c)(2) (Harrison 1978).

**24.** Georgia law authorized trial judges to request a presentence report in all criminal cases, except those involving offenses punishable by

death or life imprisonment, for the purpose of determining whether to place the defendant on probation and the conditions of his probation supervision. Ga.Code Ann. § 27–2709 (Harrison 1978). The record does not disclose why the court disregarded this statutory prohibition in this case.

counsel cross-examined each of these witnesses. In addition, the prosecutor offered the presentence report into evidence during the State's case in chief without calling Officer Rachels to the witness stand. In offering the report, the prosecutor stated that "Counsel for the Defendant has received a copy of the report so that it will be included in the record, which includes reports and letters that have been submitted by Counsel for the Defendant." In response, Moore's attorney stated, "That is agreeable, Your Honor, and at the same time, we would like for a copy of the warrants to go in also." [25] The prosecutor also introduced various other exhibits, including photographs of the victim and of the crime scene, diagrams, a crime lab report, and the victim's shotgun. Moore's counsel expressly declined to object to the introduction of any of these exhibits, including, as I have noted, the presentence report.[26] Af-

---

**25.** This statement by Moore's attorney, considered in light of the evidentiary record of Moore's first state habeas proceeding, which contains, among other things, a statement by Officer Rachels that he gave Moore's attorney a copy of the presentence report on the day of the sentencing hearing, convinces me, as it did the state habeas court and the district court below, *see infra* Part VI, that Moore's *Gardner* claim is baseless. Contrary to Moore's present allegations, his attorney had an opportunity to inspect the presentence report before the prosecutor offered it into evidence and to object if he thought that the report contained inaccurate statements or material omissions. To me, this fact explains why counsel did not object to the report on the ground that he had not seen it or, having seen it, had not had sufficient time to consult with his client about any inaccuracy in the report.

In fact, the record unequivocally demonstrates that defense counsel communicated with Officer Rachels concerning the presentence report on several occasions prior to the sentencing hearing, and that he furnished Rachels with several letters vouching for Moore's character and various records of Moore's previous academic achievements. Apparently as a matter of strategy, Moore's attorney chose to present this mitigating evidence to the trial judge through the probation officer's presentence report rather than through the live testimony of witnesses. This strategy may account for the failure of defense counsel to invoke the well-established evidentiary rules discussed *infra* note 26 and to object to the report's admission into evidence. Perhaps, the same strategy also explains why defense counsel did not object to the report on the fifth and sixth amendment grounds Moore now asserts. In pursuing this strategy, counsel must have appreciated the fact that the report's description of the murder and armed robbery simply replicated the facts the prosecutor established at the sentencing hearing and thus caused Moore no prejudice.

**26.** When the prosecutor offered the presentence report, Moore's attorney, if he wished to preclude the court from using it, could have objected to the report's admission into evidence on the ground that the report had not been authenticated by the probation officer who prepared it. This objection would have been well founded and would have prompted the prosecutor to call Officer Rachels to the stand. Even had the State authenticated the report by live testimony, the defense still could have prevented the report from being received into evidence. The defense could have established that the report was not admissible because it was merely a recording of Rachels' present recollection, and that if the prosecutor wanted to bring the contents of the report before the court he would have to do so through Rachels' live testimony, albeit refreshed by reference to the report. Assuming the validity of this argument, which had solid support in the law of evidence, *see* G. Lilly, *An Introduction to the Law of Evidence* 231–32 (1978); *see also McCormick on Evidence* § 9 (E. Cleary 2d ed. 1972), the prosecutor would have proceeded to elicit from Rachels what he had learned concerning the circumstances of both the murder and the armed robbery and of Moore's background. Any statements Moore had given Rachels would have constituted admissions and thus would not have been precluded by the hearsay rule. These statements would have been subject to objection, however, on *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and sixth amendment grounds—the argument being that Officer Rachels, in interviewing Moore and particularly in focusing on how the crimes were committed, occupied a position similar to that of a police officer interrogating a defendant in custody during a critical stage of his criminal proceedings. Because Rachels had not given Moore a *Miranda* warning and had not notified Moore's lawyer before commencing the interview, the defense could have urged the court to suppress any information Rachels obtained from Moore. Further, the defense could have objected to any background information Rachels may have obtained from sources other than Moore as hearsay, if offered to prove the truth of the contents, and on confrontation clause grounds.

In sum, Moore's attorney could have kept the entire presentence report, as a document, out of evidence on obvious evidentiary grounds. As for Officer Rachels' testimony concerning the substance of the report, Moore's attorney could have made good faith objections (1) on *Miranda* or right to counsel grounds to any statements Moore made to Rachels and to any information

ter the State rested, the defense presented its case. Moore's counsel called four witnesses, including the defendant, to establish mitigating circumstances.

Following a recess for lunch, the trial judge heard the arguments of the prosecution and of the defense, none of which was transcribed. After another recess, the trial judge sentenced Moore to death, finding beyond a reasonable doubt that Moore was engaged in armed robbery at the time of the murder and that there were no mitigating circumstances sufficient to outweigh this aggravating circumstance.[27]

derived from those statements, and (2) on confrontation clause grounds to any statements Rachels obtained from other sources if offered to prove the truth of their contents. The requirement that the sentencing decisionmaker find at least one statutory aggravating circumstance beyond a reasonable doubt, in my view, means that the full panoply of constitutional protections available during the prosecution of a criminal case applied to the sentencing phase of capital cases in Georgia in 1974, and thus to the sentencing phase of Moore's case. These rights included the rights implicated in Moore's *Estelle v. Smith* and *Proffitt* claims: the fifth amendment right not to be compelled to incriminate oneself, *see Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); the sixth amendment right to counsel, *see Mempa v. Rhay,* 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967); *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); and the sixth amendment right to confront and cross-examine the prosecution's witnesses, *see Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965); *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). Having created an adversary criminal proceeding in which the factfinder must find an aggravating circumstance beyond a reasonable doubt, as a condition precedent to the imposition of the death penalty, Georgia would have violated the Constitution if, during the sentencing phase of a capital trial, it denied the defendant the rights the Constitution guaranteed him during the guilt phase of the prosecution. *Cf. Gardner v. Florida,* 430 U.S. 349, 360, 97 S.Ct. 1197, 1206, 51 L.Ed.2d 393 (1977) (plurality) ("Our belief that debate between adversaries is often essential to the truth-seeking function of trials requires us also to recognize the importance of giving counsel an opportunity to comment on facts which may influence the sentencing decision in capital cases."); *Herring v. New York,* 422 U.S. 853, 862, 95 S.Ct. 2550, 2555, 45 L.Ed.2d 593 (1975) (noting importance of advocacy of counsel in the factfinding process of criminal trials). The conduct of the court and of counsel during the prosecution of Moore's case supports my view that Georgia's capital sentencing scheme accommodated these basic constitutional rights, including the specific constitutional rights concerning the presentence report Moore seeks to enforce in the present habeas proceeding. If Moore's trial attorney could have made these arguments at the July 1974 sentencing hearing, it logically follows that his habeas attorney could have presented them when he filed Moore's first federal habeas petition in November 1978, particularly given the state of the law in 1978. *See infra* parts IV and V.

27. The court made the following findings:

On the question of punishment, prior to the imposition of the death penalty, one statutory aggravating circumstance is found by the Court to exist, to wit: the murder of Fredger Stapleton was committed while the accused, William Neal Moore, was engaged in the commission of another capital felony, that is, armed robbery of the said Fredger Stapleton. Also, I find that the armed robbery of Fredger Stapleton was committed while the accused, William Neal Moore, was engaged in the commission of another capital felony, that is murder of the said Fredger Stapleton.

....

The death penalty statute of Georgia, Code section twenty-seven, twenty-five thirty-four point one, requiring proof of aggravating circumstances to justify the imposition of the death penalty was enacted by the General Assembly of Georgia, signed into law by the Governor of Georgia, and held to be constitutional by the Supreme Court of Georgia in Coley versus the State, two thirty-one Georgia, eight twenty-nine. It is therefore the function of this Court to apply this statute to the facts of this case in determining the punishment to be imposed. This I have done.

....

IT IS FURTHER ordered and adjudged by the Court that on the thirteenth day of September nineteen seventy-four, the defendant, William Neal Moore, shall be executed by the Director of the State Department of Corrections at such penal institution as may be designated by said Director....

....

SO, I FOUND aggravating circumstances. I also found, but I didn't need to find, for purposes of this finding, mitigating circumstances insofar as the aggravating circumstances were concerned. Mitigating means good circumstances, those being your willingness and your forthrightness in meeting what must be to you a terrible, terrible experience. So that does go to your credit, but for the purposes of this Court, for this finding, I could not in good conscience apply in your case sufficient to wipe out the aggravating statutory circumstances. We've got this. If we're going to philosophy [sic] about it, and if I'm permitted to do that, I'll do it. People in their homes—the most precious place a man

## IV.

A review of the state of the law in 1978 demonstrates that the fifth and sixth amendment claims I have described, i.e., Moore's *Estelle v. Smith* and *Proffitt* claims, were available to a reasonably competent attorney. In the next two parts of this opinion, I discuss the specific precedential antecedents of *Estelle v. Smith* and *Proffitt*. Contrary to the majority's conclusion, I believe that these antecedents provided Moore with the tools to present his fifth and sixth amendment claims in his first federal habeas corpus petition.

### A.

Moore claims that the State infringed his fifth amendment right against self-incrimination and his sixth amendment right to counsel when Probation Officer Rachels interviewed him without giving him a *Miranda* warning and giving his counsel advance notice of the interview. These infringements subsequently operated to his detriment, Moore contends, when the trial judge relied on information contained in Rachels' presentence report to determine his sentence. Moore alleges that he was not properly warned that he had a fifth amendment right to remain silent, or that the information he revealed could be used against him. He further alleges that he was not told of his sixth amendment right to consult with counsel. Moore argues, and the majority agrees, that he is excused from having presented these allegations in his earlier petition because the Supreme Court did not *explicitly* recognize that a defendant's fifth and sixth amendment rights apply to the penalty stage of a capital proceeding until its decision in *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68

L.Ed.2d 359 (1981). Because I do not believe that the constitutional principles articulated in *Estelle v. Smith* were the type of " 'new' constitutional rule[s]," *Reed v. Ross*, 468 U.S. 1, 17, 104 S.Ct. 2901, 2911, 82 L.Ed.2d 1 (1984), that might excuse a habeas petitioner from failing to invoke them at an earlier time, I believe that Moore's attempt now to seek relief under those principles is an abuse of the writ. *See Potts v. Zant*, 638 F.2d 727, 741 (5th Cir. Unit B Feb. 1981), *cert. denied*, 454 U.S. 877, 102 S.Ct. 357, 70 L.Ed.2d 187 (1981).

In *Estelle v. Smith*, the trial judge, *sua sponte*, ordered that the defendant undergo a psychiatric examination to determine his competency to stand trial for a capital crime. The judge subsequently found the defendant competent and, following a trial, a jury convicted him of the capital crime. At the penalty stage of the proceeding, the State offered the testimony of the court-appointed psychiatrist, who had examined the defendant solely for competency purposes, to prove the defendant's future dangerousness, a condition precedent to the imposition of the death penalty. Basing his testimony on his competency examination, the psychiatrist testified that he believed that the defendant would always be dangerous. The jury, relying on this testimony, mandated the death penalty. *See Estelle v. Smith*, 451 U.S. at 456–60, 101 S.Ct. at 1870–71.

The Supreme Court, affirming a unanimous panel of the former Fifth Circuit, held that the State's use of the psychiatrist's testimony had violated the fifth, sixth, and fourteenth amendments. Finding the psychiatric examination analogous to the custodial interrogation in *Miranda v.*

can have—is his home; and to be in a home, and probably this man was asleep, I don't know, or for any person to be, not this man, but any person, to be asleep in his home, to be invaded by an intruder, that's armed with weapons, that's prepared necessarily to kill (or otherwise the weapon wouldn't be there in the hands of the intruder), is probably an invasion of the highest injustice that another can do. Now, I can only imagine that anyone that is invaded by an intruder with an armed weapon, the fear that they must go through

when they are encountered in such a situation. So, I feel like that if the Court ever does require mandatory punishment—that is when they specify by law what offenses will have to be suffered by the electric chair—that one of these statutory offenses probably will be that when a person is robbed and killed in his home, that mandatory, as contrasted to discretionary, statutory aggravated circumstances will probably warrant the electric chair without life imprisonment. That justifies me in making the finding that I made.

*Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Court held that the defendant should have received a *Miranda* warning before the psychiatrist interviewed him. *See Estelle v. Smith,* 451 U.S. at 466–69, 101 S.Ct. at 1875–76. Furthermore, the Court unanimously concluded that under the sixth and fourteenth amendments, the psychiatric examination was a critical stage of the criminal proceeding, and thus the State should have forewarned the defendant's attorney that the results of that examination could be used other than for a determination of his client's competency to stand trial. Because the attorney had not been so informed, the State had denied the defendant his right to consult with counsel during a critical stage of the proceedings. *See id.* at 469–72, 101 S.Ct. at 1876–77.

Subsequently, our predecessor court held that we should apply *Estelle v. Smith* retroactively. *See Battie v. Estelle,* 655 F.2d 692, 696–99 (5th Cir.1981). The court reached this decision by relying on a two-pronged test, the first part of which is relevant to the issue presently before us. Specifically, the court stated that although "a decision which establishes a *new* principle of law" will be only prospectively applied, *id.* at 697 (emphasis added), "[a] decision which merely restates existing law or which simply applies already established law to a set of facts different from those which gave birth to the original principle is given retroactive application," *id.* The former Fifth Circuit then traced the state of the law prior to *Estelle v. Smith,* and concluded that "the holding in *Smith* followed logically from the *Miranda* decision itself," *id.* at 699, noting that both cases were "concerned with official custodial interrogations of an accused and the use of statements obtained from an accused without an attorney in such circumstances to prove the State's case against the accused." *Id.*

(footnote omitted). In sum, the court held that "*Smith* did not establish a new principle of federal constitutional law." *Id.; see also Muniz v. Procunier,* 760 F.2d 588, 590 (5th Cir.) (decision of new Fifth Circuit that the Supreme Court, in *Estelle v. Smith,* saw the State's conduct "as violating *clearly established* constitutional law") (emphasis added), *cert. denied,* 474 U.S. 934, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985).

Holdings of the former Fifth Circuit are binding upon this court unless overruled by an en banc decision. *See Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981). Because we took this case en banc, we have the opportunity to overrule the *Battie* holding if that step is desirable. I am unconvinced, however, that *Battie* was decided erroneously, and unlike Judge Godbold, I would therefore reaffirm its holding that *Estelle v. Smith* did not spring full blown and without warning into the law of criminal procedure.[28] Furthermore, even ignoring *Battie,* an investigation of what Judge Godbold terms "the state of the law in November 1978," *see ante* at 851 reveals that case law then existing "laid the basis for [Moore's] constitutional claim." *Engle v. Isaac,* 456 U.S. 107, 131, 102 S.Ct. 1558, 1573, 71 L.Ed.2d 783 (1982).

## B.

The state of the law in 1978, when Moore filed his first federal habeas petition, demonstrates that he cannot be excused for having failed to recognize and allege his *Estelle v. Smith* claim. *Estelle v. Smith* was merely the refinement of constitutional principles that the Supreme Court had already established; Moore therefore had ample thread from which to weave the fifth and sixth amendment claims recognized in

---

**28.** Judge Godbold's limited discussion of *Battie* fails to distinguish adequately the question decided in that case from the one we face today. I think it is clear that if we adopt Judge Godbold's argument, we eliminate the foundation of *Battie.* If Judge Godbold in fact means that the Supreme Court's decision in *Estelle v. Smith* was so unexpected, and such a clear break with the past, that a reasonable lawyer lacked the "tools" to raise such a claim, then I submit that this court is obligated to reconsider our precedent holding *Estelle v. Smith* retroactive. *See Allen v. Hardy,* —— U.S. ——, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986) (new constitutional standards rarely applied retroactively).

that case when he first sought federal habeas relief.

Fifteen years before its *Estelle v. Smith* decision, the Supreme Court established safeguards to protect fifth amendment rights during custodial questioning. In *Miranda v. Arizona*, 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966), the Court announced the well known *"Miranda* warning" and stated that "there can be no doubt that the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." Following *Miranda*, in *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), the Supreme Court further extended the protection of the fifth amendment. In that case, the state argued that the right against self-incrimination should not apply in juvenile courts, because proceedings in those areas were "civil" rather than "criminal." The Court, however, refused to accept such a mechanical view of the fifth amendment, finding it "clear that the availability of the privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites." *Id.* at 49, 87 S.Ct. at 1455.

The Supreme Court's expansion of the fifth amendment right against self-incrimination described above, along with its decisions broadening the sixth amendment right to counsel, *see, e.g., Mempa v. Rhay*, 389 U.S. 128, 134–37, 88 S.Ct. 254, 256–58, 19 L.Ed.2d 336 (1967) (right to counsel applies to "every stage of a criminal proceed-ing where substantial rights of a criminal accused may be affected," including sentencing and probation revocation); *In re Gault*, 387 U.S. at 34–42, 87 S.Ct. at 1447–51 (right to counsel during juvenile delinquency proceedings); *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (plurality) (majority of Court agreeing that sixth amendment right to counsel attaches at "critical stage" of proceedings), provided Moore with the tools from which he could have crafted his claim that his fifth and sixth amendment rights attached at the penalty stage of his trial as well as at the guilt stage. I cannot agree with Judge Godbold's view that in 1978 a reasonable attorney could not have recognized and presented a non-frivolous argument that the standards these cases established should also apply during the sentencing stage of a bifurcated capital trial.[29]

My conclusion is supported by two other factors especially significant in deciding whether Moore can be excused for failing to argue his *Estelle v. Smith* claim in his first federal habeas petition. First, Moore's claim arose in the context of a capital case. Following the Supreme Court's decisions in, among others, *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (plurality); *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (plurality); and *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality), a reasonable lawyer could have recognized that constitutional claims that might be unmeritorious in a non-capital proceeding could be tenable if a sentence of death was involved.[30] Indeed, even before Moore

**29.** Judge Godbold, in stating that a reasonably competent attorney could not have anticipated the application of the fifth and sixth amendments in the *Estelle v. Smith* factual context, implies that such an attorney would have had even more difficulty anticipating the application of those principles in the factual context presented in this case. *See ante* at 853 n. 10. I disagree. The applicability of the *Estelle v. Smith* principles to a probation officer's interview of the defendant is more obvious than is the applicability of those principles to a psychiatric interview of the defendant. The probation officer in this case was acting as would a policeman. He questioned the defendant during a critical stage of the criminal proceeding, and the primary focus of the interview was to elicit from the defendant precisely how he committed the murder and armed robbery of the victim.

**30.** I do not mean to argue that the rights affirmed in *Estelle v. Smith* apply only when a defendant faces capital punishment. The *Estelle v. Smith* Court rested its decision solely on the fifth and sixth amendments (as applied to the states through the fourteenth amendment), not on the eighth amendment (as applied through the fourteenth amendment). *See Estelle v.*

filed his first habeas petition, the Supreme Court had explicitly recognized that a majority of its members acknowledged the special concerns of capital sentencing and agreed that "death is a different kind of punishment from any other which may be imposed in this country." *Gardner v. Florida*, 430 U.S. 349, 357, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1977) (plurality). Second, the Court's opinion in *Gardner*, decided well over a year before Moore first sought habeas relief, eliminated any doubt that a defendant's constitutional rights apply to the sentencing stage as well as to the guilt stage of a capital case. *See id.* at 358, 97 S.Ct. at 1204–05 (sentencing process is a "critical stage" and it "must satisfy the requirements of the Due Process Clause").[31] With *Miranda* and *Gardner*, and the Court's intervening decisions, a lawyer in 1978 easily could have discerned the constitutional infirmities Moore now raises.[32]

Smith, 451 U.S. at 473, 101 S.Ct. at 1878; *Battie v. Estelle*, 655 F.2d 692, 700 n. 17 (5th Cir.1981). My discussion in the text is merely meant to point out that an attorney in 1978, recognizing that the law regarding capital sentencing was in flux, might have been especially likely to foresee the explicit application of certain constitutional safeguards to the penalty stage of a bifurcated capital proceeding.

**31.** Judge Godbold attempts to distinguish *Gardner's* importance by noting that it was a plurality opinion. First, five justices agreed that the defendant in *Gardner* was entitled to constitutional protections, other than those derived from the eighth amendment, during the sentencing phase of his trial. Second, the entire thrust of the "new law" exception to the abuse of the writ doctrine is to excuse claims based on "unanticipated" changes in the law, not to allow a petitioner to sit back and ignore his nascent claims until a majority of the Supreme Court announces a favorable decision. Thus, the number of justices who explicitly ascribed to that portion of *Gardner* relevant to this case is of no significance. For the "novelty" argument, the point is that the Court had explicitly given lawyers a powerful tool to build constitutional arguments for actions relating to sentencing.

**32.** As I demonstrated in the text, by 1978 a reasonable lawyer had the tools from which he could construct the *Estelle v. Smith* claim that Moore now seeks to assert in his successive petition. Even if the petitioner in *Estelle v. Smith* was the very first person actually to litigate his type of claim, Moore would still be unable to argue "novelty" to excuse his failure

## V.

In his second federal habeas petition, Moore also presented, for the first time in federal court, a claim that the admission into evidence of the presentence report violated his sixth amendment right to confront and cross-examine the witnesses whose statements the report memorialized. Specifically, he alleged that an opportunity to confront and cross-examine those witnesses "could have corrected the misimpressions about his financial, military and marital circumstances, clarified the circumstances of the crime, and presented the truth about his prior juvenile record." The majority today holds that Moore's failure to raise this claim in his earlier petition was excused because confrontation rights were not explicitly extended to capital-sentencing proceedings until this court's decision in *Proffitt v. Wainwright*, 685 F.2d 1227

earlier to raise his claim. The fact of the matter, however, is that before Moore brought his first federal habeas petition on November 22, 1978, litigants had already raised similar claims in other criminal cases. *See Smith v. Estelle*, 445 F.Supp. 647 (N.D.Tex.1977) (district court decision in case upon which Moore rests his claim decided nearly one year before Moore filed his federal habeas petition), *aff'd*, 602 F.2d 694 (5th Cir.1979), *aff'd*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981); *Livingston v. State*, 542 S.W.2d 655, 661–62 (Tex.Crim.App.1976) (addressing contention that testimony by state appointed psychiatrists at penalty stage of capital trial, based on interview with defendant, violated federal Constitution), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977); *Armstrong v. State*, 502 S.W.2d 731, 734–35 (Tex. Crim.App.1973) (same). Although the Texas state court decisions had rejected the claim the Supreme Court later upheld in *Estelle v. Smith*, this result does not excuse Moore's failure to raise a similar claim in his first federal habeas petition. Given that previous state court rulings contrary to a defendant's federal claim do not excuse his failure to object timely during his state court proceedings, *see Engle v. Isaac*, 456 U.S. 107, 130, 102 S.Ct. 1558, 1573, 71 L.Ed.2d 783 (1982), surely such rulings cannot excuse a petitioner's failure to raise those claims in a *federal* forum. Thus, the state court rulings cited above are significant not for their holdings, but because they evince other defendants' recognition—prior to *Estelle v. Smith*—that the state's use of certain evidence in sentencing a defendant was susceptible to a constitutional challenge.

(11th Cir.1982), *modified,* 706 F.2d 311 (11th Cir.), *cert. denied,* 464 U.S. 1002, 104 S.Ct. 508, 78 L.Ed.2d 697 (1983). Because I believe that *Proffitt,* like *Estelle v. Smith,* did not articulate a new constitutional rule, I would affirm the district court's judgment that Moore's omission of this claim in his earlier petition was not excusable.

In *Proffitt,* the defendant submitted to examination by two psychiatrists prior to sentencing. One of the psychiatrists was subsequently unable to attend the defendant's sentencing hearing before the trial judge, and his views concerning the defendant's competence and mental state were submitted solely in a written report. The defendant requested, but did not receive, an opportunity to cross-examine the psychiatrist concerning the report. *Proffitt,* 685 F.2d at 1250–51 & n. 36a.

The *Proffitt* court noted that the rights secured by the sixth amendment, including the right to cross-examine adverse witnesses, apply only to "critical stages of the trial." *Id.* at 1252 (citations omitted). Acknowledging that the protections of the sixth amendment do not apply with full force in all sentencing proceedings, the court noted that the applicability of cross-examination rights to capital-sentencing hearings "has not been specifically addressed by the Supreme Court and is an issue of first impression in this Circuit." *Id.* at 1253. The court concluded that Proffitt was entitled, under the sixth amendment, to cross-examine the psychiatrist at his sentencing hearing. *Id.* at 1255.

*Proffitt* was presaged by a long line of cases extending sixth amendment protections in a variety of contexts, as well as by cases addressing the special safeguards constitutionally mandated in capital cases. In 1965, the Supreme Court held that the sixth amendment secures the right to cross-examine adverse witnesses in state criminal proceedings. *See Douglas v. Alabama,* 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965); *Pointer v. Texas,* 380 U.S. 400, 403, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965). The High Court has repeatedly recognized that the right to cross-examine adverse witnesses,

like the right to counsel, is a fundamental requirement for a fair trial and for ensuring due process of law. *Chambers v. Mississippi,* 410 U.S. 284, 294–95, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973); *Pointer,* 380 U.S. at 405, 85 S.Ct. at 1068; *In re Oliver,* 333 U.S. 257, 273, 68 S.Ct. 499, 507, 92 L.Ed. 682 (1948).

As this court noted in *Proffitt,* 685 F.2d at 1252 (citations omitted), the right to cross-examination only applies to "critical stages of the trial." During the 1960s and 1970s, the extent to which various phases in the criminal process, including sentencing hearings, constituted "critical stages" for purposes of the sixth amendment was an unsettled question. *See, e.g., United States v. Fatico,* 579 F.2d 707, 713–14 (2d Cir.1978); Taparauskas, *An Argument for Confrontation at Sentencing: Bringing the Offender into the Sentencing Process,* 8 Cumb.L.Rev. 403, 426–40 (1977); Cohen, *Sentencing, Probation, and the Rehabilitative Ideal: The View from* Mempa v. Rhay, 47 Tex.L.Rev. 1, 1–6 (1968).

Although the law in this field was in a state of disarray, the clear trend was toward expanding the full panoply of sixth amendment rights, including the confrontation rights. *See, e.g., Clements v. Turner,* 364 F.Supp. 270, 275 (D.Utah 1973); Taparauskas, *supra,* p. 873, at 426–40 (discussing trend toward expanded right to confrontation). For example, in *Mempa v. Rhay,* 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967), the Supreme Court recognized the sixth amendment right to counsel in a sentencing and probation revocation hearing, noting as follows:

> There was no occasion in *Gideon* [*v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963),] to enumerate the various stages in a criminal proceeding at which counsel was required, but [several Supreme Court cases] clearly stand for the proposition that appointment of counsel for an indigent is required at every stage of a criminal proceeding where substantial rights of a criminal accused may be affected. In particular, [*Townsend v. Burke,* 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948),] illus-

trates the critical nature of sentencing in a criminal case and might well be considered to support by itself a holding that the right to counsel applies at sentencing. Many lower courts have concluded that the Sixth Amendment right to counsel extends to sentencing in federal cases.

*Mempa,* 389 U.S. at 134, 88 S.Ct. at 256–57 (citations and footnotes omitted). In *Morrissey v. Brewer,* 408 U.S. 471, 480, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972), the Supreme Court noted that parole revocation—*unlike sentencing*—"is not part of a criminal prosecution and thus the full panoply of rights due a defendant in such a proceeding does not apply to parole revocations." Nonetheless, the Court held that due process requires that parolees in these proceedings receive an array of procedural protections, including "the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)." *Id.* at 489, 92 S.Ct. at 2604; *see Gagnon v. Scarpelli,* 411 U.S. 778, 782, 93 S.Ct. 1756, 1759–60, 36 L.Ed.2d 656 (1973) (applying *Morrissey* to probation revocation proceedings).

By themselves, these cases probably foreshadowed our court's holding in *Proffitt* and provided a reasonable basis for the confrontation clause claim Moore seeks to present at this time. Indeed, this type of claim was recognized by many commentators and attorneys well before Moore filed his first federal habeas corpus petition in late 1978. *See, e.g., United States v. Fischer,* 381 F.2d 509, 511 (2d Cir.1967) (rejecting petitioner's confrontation clause claim involving non-capital sentencing hearing, but acknowledging that "there is a certain amount of persuasiveness to his argument"), *cert. denied,* 390 U.S. 973, 88 S.Ct. 1064, 19 L.Ed.2d 1185 (1968); *People v. Perry,* 36 N.Y.2d 114, 119, 324 N.E.2d 878, 880, 365 N.Y.S.2d 518, 520–21 (1975) (noting and rejecting defendants' confrontation clause challenge involving non-capital sentencing); *State v. Short,* 12 Wash.

App. 125, 528 P.2d 480, 483–84 (1974) (same), *review denied,* 85 Wash.2d 1002 (1975); Cohen, *Sentencing, Probation, and the Rehabilitative Ideal: The View from* Mempa v. Rhay, 47 Tex.L.Rev. 1, 1–16 (1968) (viewing *Mempa v. Rhay* as the precursor to expanded constitutional protections at the sentencing stage of criminal trials); Taparauskas, *An Argument for Confrontation at Sentencing: Bringing the Offender into the Sentencing Process,* 8 Cumb.L.Rev. 403, 426–38 (1977) (contending that Supreme Court decisions of the 1960s and 1970s foreshadowed the extension of confrontation rights to sentencing); *see also Clements v. Turner,* 364 F.Supp. 270, 275 (D.Utah 1973) ("On the heels of [*Mempa v. Rhay,*] which held that appointed counsel is required in deferred sentencing situations, has come an expansion of the right to counsel beyond even the broad limits placed upon it in that case and an expanded application of the procedural safeguards of notice, hearing, confrontation and cross-examination in the context of post-conviction proceedings."); *State v. Ortez,* 60 Haw. 107, 588 P.2d 898, 908 (1978) (noting that defendant had made no request for confrontation and cross-examination at sentencing proceeding); ABA Standards Relating to the Administration of Criminal Justice, Sentencing Alternatives and Procedures 348, 367 (Comp.1974) (discussing right to confrontation at sentencing), *cited in* Taparauskas, *supra* p. 873, at 439–40.[33]

Even if these lower court cases, commentaries, and arguments of counsel, along with the Supreme Court's decisions in *Mempa, Morrissey,* and *Gagnon,* were not sufficient by themselves to provide any reasonable attorney with the tools to fashion a *Proffitt* claim, two additional factors compel the conclusion that a *Proffitt* claim was available in 1978. As I noted in discussing Moore's *Estelle v. Smith* claim, *see supra* Part IV.B., Moore's habeas attorney should also have been prompted to raise a *Proffitt* claim (1) because Moore was con-

---

**33.** My comments in note 32 *supra* apply with equal force to the discussion in this portion of my opinion.

victed of a capital crime and (2) because the Supreme Court handed down *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), more than one year before Moore brought his habeas petition in federal court.

In light of the special nature of capital punishment, a reasonable attorney would have been more likely to press a confrontation clause argument with regard to capital sentencing than with regard to non-capital sentencing. *See supra* Part IV.B. Given the consequences of a capital sentencing proceeding, Moore could readily have argued that he must have the right to cross-examine a witness whose testimony might determine whether he receives the death penalty or life imprisonment. Moreover, *Gardner* invited this claim through its careful reading of the 1949 decision in *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949). *Williams* held that due process does not require confrontation and cross-examination protections during sentencing proceedings, at least when no objection was made on this ground and background information in the defendant's presentence report was disclosed to the defendant during the proceeding. *Id.; see also Gardner,* 430 U.S. at 355–56, 97 S.Ct. at 1203–04 (plurality). Significantly, *Gardner* noted that the constitutional protections applicable to capital sentencing were evolving, a fact recognized in *Williams. See Gardner,* 430 U.S. at 356–57, 97 S.Ct. at 1204 (quoting *Williams,* 337 U.S. at 247–48, 69 S.Ct. at 1083); *see also* Note, Gardner v. Florida: *The Application of Due Process to Sentencing Procedures,* 63 Va.L.Rev. 1281, 1283 (1977) (hereinafter Note, *Due Process in Sentencing* ). The Court in *Gardner* then proceeded to discuss cases recognizing the unique nature of capital punishment, and the post-*Williams* cases—including *Mempa*—that extended due process protections to sentencing. In light of this discussion in *Gardner,* and its holding that due process

requires that defendants be given an opportunity to explain, rebut, or deny information contained in presentence reports, *Gardner,* 430 U.S. at 362, 97 S.Ct. at 1207, a confrontation clause challenge to capital-sentencing proceedings should have been obvious to any reasonably competent attorney.[34] *See* Note, *Due Process in Sentencing, supra,* at 1291 (discussing confrontation and cross-examination as rights that *Gardner* may mandate in capital-sentencing proceedings). Thus, I respectfully dissent from the majority's holding that Moore's *Proffitt* claim is novel.

## VI.

Finally, I write separately with regard to the majority's analysis of petitioner's claim based on *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). Moore's claim is that his sentencing judge imposed the death penalty in part based on a presentence report that petitioner and his counsel did not have "any meaningful opportunity to review, correct or supplement," in violation of the eighth and fourteenth amendments. As the majority notes, this claim is obviously not based on any new legal development, because *Gardner* was decided before Moore filed his first federal habeas petition. In fact, Moore presented this claim in his first state habeas petition (in 1978), and the state court rejected the claim on the merits, finding that Moore's trial counsel had received a copy of the presentence report prior to his sentencing hearing.

When Moore brought his first federal habeas petition, on November 22, 1978, he did not include a *Gardner* claim. This omission appears to have been deliberate, and not an oversight, because the claim is noted in the procedural history portion of that petition and because Moore was represented by the attorney, James C. Bonner, Jr., who had prosecuted his state collateral

---

**34.** Moreover, Moore's counsel during his first state and first federal collateral attacks was aware of *Gardner* and presented a *Gardner* claim to the state court, claiming that Moore was not given an opportunity to deny or rebut material his presentence report contained. *See* *infra* Part VI. Surely Moore's counsel could have gone one step further and contended that Moore's sixth amendment rights were violated because he was not given an opportunity to confront and cross-examine witnesses whose statements were included in the report.

attack. Moore did not seek to add his *Gardner* claim to his petition until October 1, 1980, when his newly appointed substitute counsel sought leave to amend his petition. The district court denied Moore's motion for leave to amend his petition to add the *Gardner* claim, citing his delay in bringing the claim to federal court, his explicit reference to the claim in the procedural portion of his original petition (which indicated that he was fully aware of it when he filed that petition), and his continuous representation by counsel during his state and federal collateral attacks. *Blake v. Zant*, 513 F.Supp. 772, 805 (S.D.Ga.1981). Another ground upon which the district court relied in denying Moore's motion to amend was that his *Gardner* claim was meritless:

> [C]ounsel made explicit reference to the presentencing report issue in the original habeas petition, thus demonstrating beyond doubt that this matter had been considered by him and rejected as a basis for relief before this Court. Counsel's decision cannot be seen as unfounded. This question was considered at length by the state habeas tribunal. Testimony was received from [Moore's trial counsel] and an affidavit was introduced from the officer who prepared the report. Upon examining this evidence and the trial transcript, which appears to show that the report was turned over to [Moore's

trial counsel], the Court ruled adversely to the petitioner. No new evidence has been suggested which would cast doubt on this determination.

*Id.* (citation omitted). Although the district court did not couch this finding as an alternative basis for rejecting Moore's *Gardner* claim, it clearly viewed that claim as having been fully and correctly litigated in the state court. Moreover, it noted that Moore admittedly could produce no evidence to cast any doubt on the state court's disposition.[35]

In these circumstances, I believe we should view the district court's denial of Moore's motion to amend his habeas petition to add his *Gardner* claim as a disposition on the merits. Accordingly, we can treat his attempt to raise this claim anew as a successive petition. Because Moore has presented no reason why he is entitled to relitigate his *Gardner* claim, the claim should be denied as successive pursuant to Rule 9(b) of the Rules Governing Section 2254 Cases, *see* 28 U.S.C. § 2254 (1982).[36]

Alternatively, I believe we can affirm the dismissal of Moore's *Gardner* claim on the ground that it is conclusively without merit. As the Supreme Court noted in *Sanders v. United States*, 373 U.S. 1, 15, 83 S.Ct. 1068, 1077, 10 L.Ed.2d 148 (1963) (citations omitted), the abuse of the writ rules "are not operative in cases where the sec-

**35.** On appeal, a panel of this court affirmed the district court's denial of Moore's motion to amend, concluding that the district court did not abuse its discretion. *Moore v. Balkcom*, 716 F.2d 1511, 1526–27 (11th Cir.1983) (on rehearing), *cert. denied*, 465 U.S. 1084, 104 S.Ct. 1456, 79 L.Ed.2d 773 (1984). The panel did not discuss the district court's treatment of the merits of Moore's *Gardner* claim.

**36.** The Supreme Court has recently had occasion to examine and refine the standards governing successive federal habeas corpus petitions, i.e., petitions presenting claims that have already been litigated in a prior federal proceeding. *Kuhlmann v. Wilson*, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986). In *Kuhlmann*, a four-justice plurality of the Court concluded that the "ends of justice" mandate consideration of successive petitions only when the petitioner "supplements his constitutional claim with a colorable showing of factual innocence." *Id.* at ——, 106 S.Ct. at 2627. Three other jus-

tices expressed the view that a colorable claim of factual innocence is not essential to establish that the "ends of justice" warrant reconsideration of a petitioner's previously decided claim. *Id.* at ——, 106 S.Ct. at 2634–35 (Brennan, J., joined by Marshall, J., dissenting); *id.* at ——, 106 S.Ct. at 2639 (Stevens, J., dissenting). The two remaining justices, Justices Blackmun and White, concurred in the Court's alternative holding, *id.* at ——, 106 S.Ct. at 2628–31 (rejecting petitioner's successive claim on the merits), and expressed no view on the need for a colorable claim of factual innocence in a successive habeas petition. Thus, *Kuhlmann* leaves open the proper standard governing successive petitions. In this case, we need not decide whether a colorable claim of factual innocence is an essential prerequisite to a successive habeas petition. Regardless of whether that showing is necessary, Moore's successive *Gardner* claim should not be entertained, because he does not present any new facts or legal developments warranting relitigation of the claim.

ond or successive application is shown, on the basis of the application, files, and records of the case alone, conclusively to be without merit. In such a case the application should be denied without a hearing."

For the reasons described herein, I would affirm the district court's dismissal of the petitioner's *Gardner* claim.

### VII.

In sum, I respectfully dissent from the majority's analysis and disposition of Moore's *Estelle v. Smith* and *Proffitt* claims. In my view, these claims are not based on "new law," excusing his failure to present them in his first federal habeas petition; the district court acted well within its lawful discretion in concluding that Moore's lack of diligence in prosecuting the claims constituted an abuse of the writ. I also dissent from the court's disposition of Moore's *Gardner* claim, for the reasons expressed herein. Finally, I fully concur in the majority's disposition of Moore's remaining claims.

HILL, Circuit Judge, DISSENTING, in which FAY and EDMONDSON, Circuit Judges, join:

"When the right point of view is discovered, the problem is more than half solved." *Ellison v. Georgia R.R.*, 87 Ga. 691, 706–7, 13 S.E. 809, 813 (1891) (Bleckley, Chief Justice).

The right point of view of the issues in this case is this: successive petitions for habeas corpus create a genuine and necessary tension between the institutional desirability of finality of judgment on the one hand and, on the other, society's abhorrence of confinement or other punishment of one who is known to be innocent.

This is not a contrived dispute. It represents the inevitable difficulty in society's accommodation of divergent but valid interests.

In the administration of justice, finality achieved reasonably promptly is important. *See, e.g., Heiser v. Woodruff*, 327 U.S. 726, 733, 66 S.Ct. 853, 856, 90 L.Ed. 970 (1946) (recognizing that res judicata serves sound

"public policy that there must be some end to litigation and that when one appears in court to present his case, is fully heard, and the contested issue is decided against him, he may not later renew the litigation in another court."); *FTC v. Minneapolis-Honeywell Regulator Co.*, 344 U.S. 206, 73 S.Ct. 245, 97 L.Ed. 245 (1952) (holding that principles of finality create jurisdictional bar to untimely filing of certiorari petition). There are special reasons why finality is a proper goal in criminal justice.

At some point, the criminal process, if it is to function at all, must turn its attention from whether a man ought properly to be incarcerated to how he is to be treated once convicted. If law, criminal or otherwise, is worth having and enforcing, it must at some time provide a definitive answer to the questions litigants present or else it never provides an answer at all. Surely it is an unpleasant task to strip a man of his freedom and subject him to institutional restraints. But this does not mean that in so doing, we should always be halting or tentative. No one, not criminal defendants, not the judicial system, not society as a whole is benefited by a judgment providing a man shall tentatively go to jail today, but tomorrow and every day thereafter his continued incarceration shall be subject to fresh litigation on issues already resolved.

*Mackey v. United States*, 401 U.S. 667, 690–91, 91 S.Ct. 1160, 1178–79, 28 L.Ed.2d 404 (1971) (Harlan, J., concurring).

In civil litigation, even a supported protest that the judgment wrongfully deprives one of property or other freedom of action is usually disregarded if that judgment has reached finality. Finality is that important. *Baldwin v. Traveling Men's Ass'n*, 283 U.S. 522, 525, 51 S.Ct. 517, 517, 75 L.Ed. 1244 (1931) (in civil litigation court noted: "Public policy dictates that there be an end to litigation; that those who have contested an issue shall be bound by the result of the contest, and that matters once tried shall be considered forever settled as between parties."); *Bennett v. Commissioner*, 113 F.2d 837, 840 (5th Cir.1940) ("[T]he rule of *res judicata* does not go to

whether the judgment relied on was a right or wrong decision. It rests on the finality of judgments in the interest of the end of litigation and it requires that the fact or issue adjudicated remain adjudicated.").

In this country, we acknowledge that our institutions must be fallible because they are the workings of fallible humans and not monarchs divinely appointed. While some risk of the wrong result must be taken in the administration of justice, we recoil from the imprisonment or punishment of one whose innocence can be demonstrated.

Given the right point of view—that this tension must exist in habeas corpus litigation—we see that it has been the task of Congress to relieve the tension to the extent proper. In my view the Congress has done that in its provisions for our dealing with successive habeas corpus petitions. 28 U.S.C. § 2244(a), (b) (1982).

First, these enactments do not disturb the authority of the judicial branch to hear and decide, on first federal petition for habeas corpus, claims of constitutional error in the state court proceedings. Unless limited by some other provision or precedent, *see Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), relief may be granted from state custody where there has been grievous denial of constitutional rights whether or not the petitioner asserts innocence. I take no issue with that; it is compelled by controlling Supreme Court precedent.

What is subject to our resolution today is the availability of successive petitions. Legislative history makes it clear that in 1966, congressional amendment to section 2244 was to achieve "a greater degree of finality of judgments in habeas corpus proceedings" and to add to section 2244 "provisions for a qualified application of the doctrine of *res judicata*." S.Rep. No. 1797, 89th Cong., 2d Sess. 2, *reprinted in* 1966 U.S.Code Cong. & Admin.News 3663, 3664.

Congress successfully accommodated these tensions. It gave the courts authority to refuse to hear petition after petition after petition for the writ of habeas corpus

brought by state prisoners, whether claiming innocence or not. However, the establishment of finality in these cases carries the risk that one who is demonstrably innocent may yet be incarcerated only because there is no procedure for obtaining a release order. Therefore, whatever may have been the history of the post-conviction litigation in state or federal court, a U.S. district judge is authorized to accept, hear, and consider a successive and even abusive petition for the writ of habeas corpus by a state prisoner should the "ends of justice" require it.

In my view, the meaning of the 1966 amendment must be discovered here by reference to the problem being addressed. If the courts conclude that a determination of the existence *vel non* of "ends of justice" will depend upon whether or not the petitioner claims and offers to prove his innocence, then the goal of finality will have been achieved as far as reasonably possible. The innocent will have a "safety valve" from finality; the guilty will have reached the end of litigation.

In the context of death penalty habeas corpus litigation, one may be guilty of murder and yet not subject to the death penalty. Thus, when I advocate that a district judge ought to be able to hear a petition brought by one claiming innocence, I would interpret "innocence," where the death penalty is involved as being innocent of any statutory aggravating circumstance essential to eligibility for the death penalty.

The petitioner in this case makes no claim of innocence; he long ago and promptly confessed to murder accompanied by statutory aggravating circumstances. For the reasons stated above, therefore, and for the reasons so much better articulated in parts II and III of the opinion of Justice Powell in *Kuhlmann v. Wilson*, 477 U.S. 436, ___, 106 S.Ct. 2616, 2622–28, 91 L.Ed.2d 364 (1986), I would affirm the district court's judgment dismissing the petition.

For these reasons I respectfully DISSENT.